******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* LATROY JOHNSON
(SC 20778)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

Convicted of two counts of murder and one count of assault in the first degree, among other crimes, in connection with the shooting of multiple victims, the defendant appealed to this court. The defendant claimed that the evidence was insufficient to defeat his claims of self-defense and defense of others with respect to the murder of one of the murder victims, W, and that the trial court improperly denied his request to admit evidence that another victim, T, previously had been convicted in New Jersey of the crime of arson to demonstrate T's violent character. *Held*:

The evidence was sufficient to defeat the defendant's claims of self-defense and defense of others with respect to the murder of W.

The defendant did not contest the sufficiency of the evidence to defeat his justification defenses with respect to his shooting of certain other victims, the evidence plainly demonstrated that those shootings, as well as the shooting of W, were part of a single, continuous episode occurring at the same location and time, and the jury reasonably could have credited testimony that W was acting defensively, rather than offensively toward the defendant, in an unsuccessful effort to protect one of the other victims from the defendant's violent assault.

Any error in the trial court's exclusion of evidence of T's New Jersey arson conviction was harmless, as that evidence would not have substantially swayed the jury's verdict.

There was no evidence that T was armed or the aggressor in the shootings, although the facts underlying T's arson conviction were not reflected in the record, the fact that T intentionally had set fire to a building or structure at some point in time for some unknown purpose did not make it more likely that he would use a firearm with the intent to kill or to inflict serious bodily injury, and there was abundant evidence to support a finding that, even if T had been the aggressor during the confrontation, the defendant had a duty to retreat.

Argued November 4, 2024—officially released January 14, 2025

*Procedural History*

Substitute information charging the defendant with two counts of the crime of murder, and with one count

each of the crimes of assault in the first degree, criminal use of a firearm, criminal possession of a firearm and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *D'Addabbo, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Vishal K. Garg*, assigned counsel, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Erika Brookman*, senior assistant state's attorney, and *Vicki Melchiorre*, former supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ECKER, J. In the early morning hours of September 23, 2017, the defendant, Latroy Johnson, shot and killed two victims, Joshua Taylor and Jovan Wooten, and seriously injured a third, Kiwan Smith. At trial, the defendant testified on his own behalf, admitting that he intentionally shot and killed Taylor and Wooten, but claiming that the killings were justified on the grounds of self-defense and defense of others. The jury rejected the defendant's justification defenses and found him guilty of the crimes of murder, assault in the first degree, criminal use of a firearm, criminal possession of a firearm, and carrying a pistol without a permit. In this direct appeal, the defendant contends that (1) the evidence was insufficient to defeat his claims of self-defense and defense of others with respect to Wooten, and (2) the trial court improperly excluded evidence of Taylor's violent character under § 4-4 (a) (2) of the Connecticut Code of Evidence. We affirm the judgment.

The jury reasonably could have found the following facts. On September 22, 2017, two of the victims, Smith

and Taylor, traveled from New York to Hartford in a Mercedes-Benz sport utility vehicle to provide financial assistance to Karee Iverson and his friends. Iverson had asked Smith to bring money, but, instead, Smith brought seventy-four bags of heroin. Smith and Taylor first went to the home of Iverson's cousin, Wooten, and then to the home of Iverson, where the defendant was present. At some point in the evening, the defendant, Smith, Taylor, Wooten, and Iverson decided to drive to Albany Avenue to purchase alcohol from a package store and food from a nearby pastry shop. On the way to the pastry shop, Smith traveled with Taylor in the Mercedes-Benz, while Wooten drove with Iverson and the defendant in another vehicle.

The area around the pastry shop is known as a popular "party scene," and the five men stayed there to socialize. Everyone was getting along until approximately 12:37 a.m., when Smith and Taylor got into a verbal disagreement with Iverson and the defendant. Wooten tried to defuse the situation without success. When Taylor walked over to the Mercedes-Benz and opened the trunk, the defendant stood up, walked toward Taylor, and shot him once in the head with a semiautomatic pistol. The defendant then approached Smith, spoke to him briefly, and shot him four times— three times in the chest and once in the arm. Neither Taylor nor Smith was armed. After the shooting began, Wooten, who was carrying a pistol, ducked behind the Mercedes-Benz and attempted to protect Smith by shooting in the defendant's direction. The defendant shot Wooten once in the head and then fled the scene on foot, heading in the direction of Oakland Terrace. The defendant did not call the police or summon emergency medical assistance for the victims.

Authorities responded to the shooting within minutes. Taylor was pronounced dead upon their arrival, and Wooten was transported to the hospital, where he later died as

a result of the gunshot wound inflicted by the defendant. Although Smith survived the shooting, he suffered serious bodily injuries, including a collapsed lung and nerve damage to his arm. A fourth victim, Keane Skyers, was caught in the crossfire. Skyers suffered multiple gunshot wounds but was not killed in the shooting.[1]

The police found no firearms or other weapons in their search of the trunk of the Mercedes-Benz and the area surrounding Taylor's body. Wooten was found holding a .40 caliber Smith & Wesson pistol in his hand. Nearby were three .40 caliber shell casings stamped "Federal .40 S & W." Later investigation revealed that Wooten had a valid permit to carry a firearm, that the Federal .40 S & W shell casings had been fired from Wooten's pistol, and that Wooten had gunshot residue on his right hand. The bullets that killed Taylor and Wooten, however, had not been fired from Wooten's pistol.

Although no other firearm was found at the scene, a group of three additional .40 caliber shell casings was discovered directly behind the Mercedes-Benz. These shell casings differed from the ones found near Wooten because they were marked "Sig .40 S & W." Subsequent forensic testing showed that they had not been fired from Wooten's firearm. Approximately one month after the shooting, a semiautomatic, .40 caliber Glock pistol was found abandoned on Oakland Terrace, the street toward which the defendant had fled on the night in question. The state's forensic examiner later determined that the Sig .40 S & W shell casings had been discharged from this weapon. The state presented expert testimony that the bullets that killed Taylor and Wooten were consistent with having been fired from a Glock pistol, but the expert witness could not say

---

[1] Skyers declined to cooperate with the police investigation, and the defendant was not charged with any crime in connection with Skyers' injuries.

definitively whether they had been fired from the particular Glock pistol found on Oakland Terrace.

The police obtained video surveillance footage of the shooting from nearby businesses. In the surveillance footage, Taylor can be seen casually approaching the trunk of a parked Mercedes-Benz, opening the trunk, and rubbing his face with his hands. The defendant is sitting nearby, while Smith, Wooten, Iverson, and other individuals mill about. After Taylor opens the trunk, the defendant suddenly stands up, approaches Taylor, and shoots him in the head. Taylor falls to the ground, and the defendant walks toward Smith as bystanders scatter. Smith and the defendant appear to communicate briefly as Wooten ducks behind the Mercedes-Benz. Seconds later, Smith falls to the ground, and the defendant walks to the other side of the Mercedes-Benz toward Wooten. Wooten and the defendant appear to exchange gunfire, after which Wooten falls to the ground. The defendant then puts his firearm in his pants and quickly walks away. As he is leaving, the defendant hurries past Skyers, who stumbles and collapses. The entire encounter, from the time the defendant shot Taylor until he fled the scene, lasted less than one minute.

Both Smith and Iverson testified at the defendant's trial. Their testimony was largely consistent, although they disagreed as to what prompted the shooting and whether any threats were made. Smith testified that the shooting was preceded by a verbal disagreement between him, Iverson, and the defendant over Iverson's and the defendant's use of the illegal drug phencyclidine (PCP) that night, and that neither Taylor nor Smith threatened the defendant or Iverson. Smith identified the defendant as the individual who shot him, Taylor, and Wooten. Iverson testified that he did not use PCP that night and that the disagreement was not over PCP but, instead, was about money that Smith claimed was owed to him by Iverson. Iverson stated that Smith had

threatened to kill him, that he did not see anyone with a gun that night, and that he did not know who shot Taylor, Smith, and Wooten because he ran away as soon as he heard gunshots.

The defendant testified in his own defense. He admitted that he was carrying a handgun that night, even though he was a convicted felon who was not permitted or licensed to carry a firearm.[2] The defendant explained that he had obtained the handgun from someone standing outside of the package store because he knew Wooten was armed and because Smith had told him earlier in the evening that he and Taylor were "riding dirty," which he understood to mean that they were carrying firearms. The defendant wanted the firearm for protection because he walks with a limp and is unable to run quickly as a result of a prior injury.

Like Smith and Iverson, the defendant testified that the shooting was precipitated by a verbal disagreement, but, according to the defendant, the disagreement was not about drugs or money; it was about a woman. The defendant stated that Taylor was trying to talk to Skyers' girlfriend, but she was ignoring him, which sent Taylor into a rage. Smith was also in a rage because the defendant and Iverson had interceded on the woman's behalf. Taylor said to the defendant, "if I had it on me already, I would've popped you just now," which the defendant interpreted to mean that Taylor would have shot him with a firearm. Wooten attempted to calm Taylor and Smith down, but Taylor "was still enraged, and he said, 'nah, I got something in my trunk that'll light the whole block up.' " The defendant believed that this meant that Taylor had "a machine gun, [an] AK-47—something big, something [that would] . . . shoot a lot of bullets at

---

[2] The defendant denied that the Glock pistol found on Oakland Terrace was the one he used that night. According to the defendant, he was carrying a .38 caliber special revolver, not a semiautomatic .40 caliber Glock pistol.

once . . . ." The defendant was afraid for his own safety and for that of others around him, particularly a woman who was pregnant. When Smith told Taylor to "go ahead," and Taylor walked over to the Mercedes-Benz and opened the trunk, the defendant felt "obligated" to do something to protect himself and the public. So, he walked up to Taylor and shot him.

The defendant testified that, after shooting Taylor, he approached Smith and asked him, "what are you doing? Why did you bring these guys?" While the defendant was talking to Smith, Wooten went behind the Mercedes-Benz and began shooting toward Skyers and Iverson. Contrary to Smith's testimony, the defendant stated that it was Wooten, not him, who shot and injured Skyers and Smith. The defendant explained that he shot and killed Wooten to eliminate the threat he posed to the public. After shooting Wooten, the defendant walked toward Oakland Terrace, passing an injured Skyers, whom he told "to sit and wait for an ambulance." The next day, the defendant returned the handgun to the person who had given it to him, telling him that it was "dirty," meaning that it had been used to shoot someone.

On cross-examination, the defendant acknowledged that he did not see Taylor point a gun at him, did not attempt to retreat or run away, and did not warn Taylor to "stop, or I'm going to shoot you," before pulling the trigger and killing him. The defendant explained that the incident escalated quickly and that he could not retreat safely due to his disability and the ongoing risk to the public. He also stated that he told Taylor to "stop" as he shot him. The defendant conceded that, after the shooting, he did not contact the police and tell them that he had acted in self-defense or defense of others; nor did he summon emergency medical assistance for the victims.

The jury found the defendant guilty of two counts of murder in violation of General Statutes § 53a-54a (a) and one count each of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), criminal use of a firearm in violation of General Statutes § 53a-216, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). The trial court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of 105 years of incarceration. This appeal followed.

I

The defendant contends that the evidence was insufficient to defeat his claims of self-defense and defense of others with respect to Wooten because, "[a]t the time the defendant shot Wooten, Wooten was an active shooter who was shooting at members of the defendant's community." The state responds that the evidence was sufficient to support the jury's verdict because the defendant shot Wooten during the same deadly encounter in which he murdered Taylor and assaulted Smith, and, therefore, "a rational fact finder could conclude that the state had disproved at least one of the components of self-defense, or [had proved] the disqualifier that the defendant failed to abide by his duty to retreat." We agree with the state.

Self-defense and defense of others are justification defenses. As such, they "operate to exempt from punishment otherwise criminal conduct when the harm from such conduct is deemed to be outweighed by the need to avoid an even greater harm or to further a greater societal interest. . . . Thus, conduct that is found to be justified is, under the circumstances, not criminal." (Internal quotation marks omitted.) *State* v. *Bryan*, 307 Conn. 823, 832–33, 60 A.3d 246 (2013). Pursuant to Gen-

eral Statutes § 53a-19 (a), a person is justified in using deadly physical force to defend himself or others against an imminent use of physical force by a third person only if "the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm." Thus, four conditions must exist for an act of violence to be justified on the grounds of self-defense or defense of others: "(1) the defendant must actually have believed that the victim was using or was about to use physical force against him [or others], (2) a reasonable person, viewing all the circumstances from the defendant's point of view, would have shared that belief, (3) the defendant must actually have believed that the degree of force he used was necessary for defending himself or herself [or others], and (4) a reasonable person, viewing all the circumstances from the defendant's point of view, also would have shared that belief." (Internal quotation marks omitted.) *State* v. *Washington*, 345 Conn. 258, 278–79 n.8, 284 A.3d 280 (2022); see also *State* v. *Bryan*, supra, 833–34 (self-defense and defense of others are governed by same legal principles).

There are statutory exceptions to self-defense and defense of others, only one of which—the duty to retreat—is applicable in the present appeal.[3] Pursuant

---

[3] The state relies on another statutory exception, the initial aggressor exception, which is codified at § 53a-19 (c) (2). See General Statutes § 53a-19 (c) (2) ("a person is not justified in using physical force when . . . he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force"). Although the state requested an initial aggressor jury instruction, the trial court never issued the requested instruction, and, consequently, the jury was not presented with this legal theory at trial. We therefore have no basis for determining whether the jury reasonably could have found the evidence sufficient to reject the defendant's justification defenses under this alternative legal theory. Moreover, neither the state nor the defendant has challenged the propriety of the trial court's jury instructions on appeal; nor have they asked us to recharacterize the defendant's evidentiary insufficiency claim as an instructional impropriety claim. See

to § 53a-19 (b) (1), "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating . . . ." "The underlying policy of the duty to retreat is that the protection of human life has a higher place in the scheme of social values than the value that inheres in standing up to an aggression." *State* v. *Anderson*, 227 Conn. 518, 530, 631 A.2d 1149 (1993).

The state bears the burden of disproving the defendant's justification defenses beyond a reasonable doubt. See *State* v. *Revels*, 313 Conn. 762, 779, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015); see also General Statutes § 53a-12 (a). To sustain its burden, the state must disprove beyond a reasonable doubt any of the components of these defenses or establish "beyond a reasonable doubt that any of the statutory exceptions . . . codified [at] § 53a-19 (b) and (c) applied." *State* v. *Grasso*, 189 Conn. App. 186, 200, 207 A.3d 33, cert. denied, 331 Conn. 928, 207 A.3d 519 (2019). In assessing the sufficiency of the evidence, we must focus on the theory of self-defense and defense of others that was presented at trial. See *State* v. *Revels*, supra, 779; *State* v. *Grasso*, supra, 197–98; see also footnote 3 of this opinion.

The standard of review governing a challenge to the sufficiency of the evidence to defeat a claim of self-

*State* v. *Russell*, 101 Conn. App. 298, 327 n.30, 922 A.2d 191 (claim predicated on insufficient evidence under trial court's "jury charge rather than [directed] to the elements of the crime as statutorily defined and as set out in the information" is one that "sounds in alleged instructional error," not insufficiency of evidence), cert. denied, 284 Conn. 910, 931 A.2d 934 (2007). Because we conclude that the evidence is sufficient under the instructions charged to the jury, we need not address the applicability of the initial aggressor exception. See, e.g., *State* v. *Brown*, 345 Conn. 354, 378–79 and n.10, 285 A.3d 367 (2022) (declining to recharacterize insufficiency of evidence claim as instructional impropriety claim because evidence was sufficient to support verdict on basis of charge given to jury).

defense or defense of others "is the same [as the] standard used when examining claims of insufficiency of the evidence." (Internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 778. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) Id.

We note at the outset that the defendant does not challenge the sufficiency of the evidence to defeat his justification defenses with respect to the murder of Taylor and the assault of Smith. Thus, for purposes of the present appeal, it is undisputed that the jury reasonably could have found that the defendant unjustifiably killed Taylor and injured Smith mere seconds before he shot and killed Wooten. The jury's factual findings in this regard are consistent with the testimonial, physical, and video evidence. Smith testified that he and Taylor got into a verbal disagreement with Iverson and the defendant, during which no punches were thrown, no threats were made,[4] and no weapons were brandished or visibly displayed. Smith stated that neither he nor Taylor was armed with firearms or other weapons and that there were no firearms or weapons in the Mercedes-Benz. According to Smith, Wooten was not a participant in the verbal disagreement. Instead,

---

[4] Although the defendant and Iverson testified that Taylor and Smith threatened violence prior to the shooting, the jury was free to discredit their versions of events. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 399–400, 267 A.3d 81 (2021) (in assessing whether evidence is sufficient to defeat claim of self-defense, "the trier of fact is entitled to believe or disbelieve all, part, or none of any witness' testimony").

Wooten was attempting to act as "the peacemaker" and to defuse the situation.

The jury was also entitled to credit Smith's testimony that, as a result of this verbal disagreement, the defendant shot Taylor "in the head . . . at point-blank range . . . ." After shooting Taylor, the defendant turned to Smith, who said, "you just shot my boy." The defendant responded by shooting Smith four times. Wooten attempted to protect Smith, and "that's when [the defendant] shot [Wooten] in the head."

Smith's testimony largely was corroborated by the video surveillance footage, which does not depict any physical violence or the display of any firearms or weapons prior to the defendant's approaching Taylor and shooting him at close range. After the defendant shoots Taylor, there is a short pause of approximately fifteen seconds, during which the defendant appears to communicate briefly with Smith. Smith then falls to the ground. The defendant and Wooten promptly appear to exchange gunfire before Wooten collapses. The entire encounter lasted less than one minute.

The physical evidence was also consistent with Smith's version of events.[5] The subsequent police inves-

---

[5] The defendant contends that Smith's testimony was inconsistent with the physical evidence for two reasons. First, only three Sig .40 S & W shell casings were found at the scene of the crime, which he claims is inconsistent with Smith's testimony that the defendant shot him four times, in addition to shooting Taylor and Wooten each once. Second, the defendant observes that the .40 caliber Glock pistol that he purportedly used had a fifteen round magazine but still contained eleven bullets when it was recovered on Oakland Terrace, which the defendant argues indicates that it had been used to discharge five bullets at most (four bullets from the magazine and one from the chamber). According to the defendant, this evidence demonstrates that it was factually impossible for him to have discharged his firearm six times consistent with Smith's testimony. We reject both claims. With respect to the number of Sig .40 S & W casings found at the scene, although only six bullet casings were found, three of which had been discharged by Wooten's firearm, the evidence demonstrated that more than a total of six bullets had been fired; in addition to the six bullets that hit Taylor, Wooten, and Smith, Skyers also was shot multiple times. From this evidence, the jury reasonably

tigation revealed that neither Taylor nor Smith was armed with any firearms or other weapons; nor were any firearms or other weapons found in the Mercedes-Benz. Moreover, Wooten's pistol did not fire the fatal bullets. The bullet that killed Taylor was .40 caliber in size and consistent with having been fired by a semiautomatic .40 caliber Glock pistol, such as the make and caliber of the firearm found on Oakland Terrace.

By not raising a sufficiency claim with respect to Taylor and Smith, the defendant concedes, as we think he must, that the foregoing evidence was sufficient to meet the state's burden of defeating the defendant's justification defenses with respect to those victims. The jury rationally could have found, beyond a reasonable doubt, and contrary to the defendant's testimony, that he did not actually believe that Taylor or Smith was about to use deadly physical force against him or others, that, even if he harbored such a belief, it was not objectively reasonable under the circumstances, and that the degree of deadly force used by the defendant was not subjectively or objectively reasonable. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 400, 267 A.3d 81 (2021) ("[the jury] was free to discredit the defendant's version of the events immediately preceding and following the shooting and, instead, could have credited the testimony of the other witnesses"); *State* v. *Terry*, 161 Conn. App. 797, 807–808, 128 A.3d 958 (2015) ("the jury was free to disbelieve the defendant's voluntary statement and to conclude beyond a reasonable doubt that he could not reasonably have believed that he was faced

could have inferred that there were additional shell casings that were lost in the aftermath of the shooting. As for the Glock pistol used by the defendant, it was found on Oakland Terrace after it had been abandoned for more than one month. Given the passage of time between the date on which the pistol was used to commit the crimes charged in this case and the date on which it was discovered, the jury reasonably could have inferred that the defendant or another person had substituted the magazine or altered its contents at some point after the shooting and before the pistol was found.

with the imminent use of deadly physical force or that
the degree of deadly physical force that he used against
[the victim] was necessary to defend himself"), cert.
denied, 320 Conn. 916, 131 A.3d 751 (2016). The evi-
dence likewise is sufficient to support, beyond a reason-
able doubt, the conclusion that the shootings of Taylor
and Smith were not justified because the defendant
could have retreated in complete safety and thereby
avoided the necessity of using deadly physical force.
See, e.g., *State* v. *Garrison*, 203 Conn. 466, 471–72, 525
A.2d 498 (1987) (evidence was sufficient to support
factual finding that defendant knew he could have
retreated in complete safety because he was familiar
with apartment and was positioned near unobstructed
doorway); *State* v. *Pranckus*, 75 Conn. App. 80, 94, 815
A.2d 678 (evidence that defendant initiated confronta-
tion, that victim "merely was defending himself from
the defendant's attacks and that the defendant strode
six feet toward the victims to stab [them] instead of
retreating was sufficient to allow the jury reasonably
to conclude that the defendant knew no harm would
have befallen him in making that retreat"), cert. denied,
263 Conn. 905, 819 A.2d 840 (2003).

On appeal, the defendant attempts to separate the
murder of Taylor and the assault of Smith from the
killing of Wooten, arguing that the state failed to estab-
lish beyond a reasonable doubt that the shooting of
Wooten was not justified. The defendant's argument
ignores the evidence plainly demonstrating that the
three shootings were part of a single continuous episode
occurring at the same location and time. The defendant
shot two unarmed men and then shot Wooten as Wooten
was attempting to protect others and himself from the
defendant's criminal conduct. By all accounts, prior to
the shootings, Wooten was not involved in the verbal
altercation, did not threaten the defendant or anyone
else, and tried to defuse the situation. In addition to

Smith's testimony that Wooten was attempting to pre-
vent the outbreak of violence, Iverson testified that
Wooten "was trying to break . . . up" the argument
before the defendant began his shooting spree. Even the
defendant testified that, prior to the shooting, Wooten
urged Smith to avoid violence because Wooten was
concerned about the safety of innocent bystanders.

Although Wooten was armed with a firearm that
night, his possession of the firearm was lawful, and
there was no evidence that he brandished the weapon
or threatened anyone with it until after the defendant
shot Taylor and Smith. Wooten fired his firearm three
times, but the jury reasonably could have credited
Smith's testimony that Wooten was acting defensively,
rather than offensively, in an unsuccessful effort to
protect Smith from the defendant's violent assault.
Stated another way, the evidence supported a reason-
able inference that Wooten was trying to repel the
defendant's unprovoked attack and that he posed no
threat to the defendant or others if the defendant had
stopped shooting and retreated.[6] We therefore reject
the defendant's challenge to the sufficiency of the evi-
dence to defeat his claims of self-defense and defense
of others with respect to the murder of Wooten.

## II

We next address whether the trial court improperly
excluded evidence of Taylor's violent character under
§ 4-4 (a) (2) of the Connecticut Code of Evidence, which

---

[6] This conclusion is consistent with the state's theory at trial, which was
that the shooting of Wooten was not justified because Wooten was protecting
Smith from the defendant's attack. In her rebuttal closing argument, the
prosecutor argued: "Watch the video. The first person to shoot is the defen-
dant. Wooten runs. He runs off. . . . He runs off . . . toward the direction
of Woodland Street. He then sees his friend [Smith] getting shot. He comes
back to help [Smith]. And then, you can see . . . right between the cars,
you can see him go down. . . . You can see the defendant jumping over
the vehicle to shoot . . . Wooten."

provides that evidence is admissible "in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor . . . ."[7] The following additional facts and procedural history are relevant to our disposition of this claim.

Prior to trial, defense counsel filed a motion in limine to introduce evidence of Taylor's New Jersey criminal record. Specifically, defense counsel moved to admit evidence that Taylor had been convicted in New Jersey of aggravated assault and possession of a weapon for an unlawful purpose. During a pretrial hearing, the prosecutor objected to the motion in limine. The prosecutor contended that Taylor had been arrested for, but not convicted of, aggravated assault and possession of a weapon for an unlawful purpose in New Jersey. The prosecutor acknowledged that Taylor had "a felony conviction for arson" in New Jersey but argued that the arson conviction was inadmissible because it was "not [for] a crime of violence against a person." The trial court deferred ruling on defense counsel's motion to give the parties additional time to inquire into the status of Taylor's New Jersey criminal record.

---

[7] Section 4-4 of the Connecticut Code of Evidence provides in relevant: "(a) Evidence of a trait of character of a person is inadmissible for the purpose of proving that the person acted in conformity with the character trait on a particular occasion, except that the following is admissible:

* * *

"(2) Evidence offered by an accused in a homicide or criminal assault case, after laying a foundation that the accused acted in self-defense, of the violent character of the victim to prove that the victim was the aggressor, or by the prosecution to rebut such evidence introduced by the accused. . . ."

Subsection (b) of § 4-4 delineates the methods by which the character of the victim may be proved: "In all cases in which evidence of a trait of character of a person is admissible to prove that the person acted in conformity with the character trait, proof may be made by testimony as to reputation or in the form of an opinion. In cases in which the accused in a homicide or criminal assault case may introduce evidence of the violent character of the victim, the victim's character may also be proved by evidence of the victim's conviction of a crime of violence."

The issue did not arise again until after the close of evidence, when defense counsel moved to reopen the defendant's case for the purpose of arguing the admissibility of Taylor's New Jersey arson conviction. Defense counsel argued that § 4-4 (a) (2) of "the Connecticut Code of Evidence provides that, in homicide cases [in which] the defendant is claiming self-defense, [the defendant] can introduce evidence of any violent convictions any victim has, just to show [the victim's] proclivity for violence." Pursuant to this provision, defense counsel sought to admit evidence of Taylor's arson conviction on the ground that "arson is a crime of violence." In support of her argument, defense counsel pointed out that the Connecticut Department of Correction (DOC) considers the crime of arson "to be an 85 percent offense that's on the [list of] violent crimes . . . at [the] DOC.[8] And arson can definitely result in the deaths of

---

[8] Defense counsel appears to be referring to crimes involving "the use, attempted use or threatened use of physical force against another person" under General Statutes § 54-125a (b) (2), the conviction of which disqualifies a defendant from parole eligibility until he or she "has served not less than eighty-five per cent of the definite sentence imposed." Under regulations promulgated by the Board of Pardons and Paroles (board), certain offenses are designated as involving "the use, attempted use or threated use of physical force against another person," including the crimes of arson in the first degree and arson in the second degree. Regs., Conn. State Agencies § 54-125a-5 (a); see General Statutes § 53a-111 (first degree arson); General Statutes § 53a-112 (second degree arson). Defense counsel urged the trial court to conclude that the conviction of an offense that requires a defendant to serve 85 percent of his sentence under § 54-125a (b) (2) qualifies as the conviction of a crime of violence for purposes of § 4-4 (a) (2) of the Connecticut Code of Evidence.

Although not essential to our disposition of the defendant's evidentiary claim, we observe that the generalization made by defense counsel regarding the classification of arson as a crime of violence is not entirely accurate. The crime of arson in the third degree, which does not involve the use, attempted use, or threatened use of physical force against another person, is not listed in the board's regulations as a crime requiring a person to serve 85 percent of the imposed sentence. See Regs., Conn. State Agencies § 54-125a-5 (a); see also General Statutes § 53a-113 (a) ("[a] person is guilty of arson in the third degree when he recklessly causes destruction or damage to a building . . . of his own or of another by intentionally starting a fire or causing an explosion").

one to large amounts of people. I think it's very relevant in this case, particularly in . . . light of [the defendant's] testimony that he was concerned [that] they wanted to injure more people. We would like to introduce . . . the arson conviction of . . . Taylor into evidence." (Footnote added.)

In response, the trial court inquired: "Let's assume that I agree with you and allow it. How do you plan to do it?" Defense counsel responded, "[p]erhaps by stipulation or a copy of the—," at which point the trial court interrupted, stating, "[t]he state's not going to stipulate, I'm assuming." The trial court then asked the prosecutor whether he was willing to stipulate to the admissibility of Taylor's New Jersey arson conviction, and the prosecutor responded, "[n]o." In the absence of a stipulation, the trial court asked defense counsel, "how are [you] going to get it in?" At this point, the following colloquy occurred:

"[Defense Counsel]: It's a conviction, I believe, from either New Jersey or New York.

"The Court: Do you have a certified copy of it?

"[Defense Counsel]: I don't have a certified copy, Your Honor.

"The Court: So, you just have your investigative notes?

We further note that, like Connecticut, New Jersey recognizes different degrees of the crime of arson, some of which require proof of a danger of death or bodily injury to another person, but others of which only require proof of damage or destruction to property. See N.J. Stat. Ann. § 2C:17-1 (a) (1) (West 2015) (second degree arson, requiring "danger of death or bodily injury" to another person); N.J. Stat. Ann. § 2C:17-1 (a) (2) (West 2015) (second degree arson, requiring only "[the] destroying [of] a building or structure of another"); N.J. Stat. Ann. § 2C:17-1 (b) (2) (West 2015) (third degree arson, requiring only "danger of damage or destruction" to another's building or structure); see also footnote 11 of this opinion. The record does not reflect the nature of Taylor's New Jersey arson conviction or whether it involved the use, threatened use, or attempted use of physical force against another person.

"[Defense Counsel]: Yes.

"The Court: Thank you. State?

"[The Prosecutor]: I'll leave it to the court.

"The Court: Okay. All right. Let me think about that for a couple of minutes."

Following a brief recess, the trial court denied the defendant's request to admit evidence of Taylor's New Jersey arson conviction, stating that subsection (b) of § 6-7 of the "Connecticut Code of Evidence . . . which addresses evidence of conviction of a crime . . . says: 'Methods of proof. Evidence that a witness has been convicted of a crime may be introduced by the following methods.' Now, obviously, [Taylor is] not a witness, but he is involved in this case. '[1] Examination of the witness as to the conviction; or (2) introduction of a certified copy of the record of conviction into evidence, after' there's been an identification and authentication of the person and the conviction. Obviously, the defense doesn't have a certified copy. So, therefore, the court declines to allow the defense to put that into evidence."[9]

The defendant claims that the trial court improperly determined that a certified copy of Taylor's New Jersey arson conviction was required because § 4-4 (b) of the Connecticut Code of Evidence, not § 6-7 (b), controls the method of proof for the admission of character evidence. See footnotes 7 and 9 of this opinion. The state responds that the evidence of Taylor's arson conviction

---

[9] Section 6-7 (a) of the Connecticut Code of Evidence provides in relevant part that, "[f]or the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year. . . ." The method of proof is set forth in subsection (b) of § 6-7, which provides that a prior conviction may be established by "(1) examination of the witness as to the conviction; or (2) introduction of a certified copy of the record of conviction into evidence, after the witness has been identified as the person named in the record."

was inadmissible because the defendant could not identify a "witness or document, which would not be barred by the hearsay rule, [and] through which [the defendant was able] to present [this] evidence . . . ." The state further argues that the exclusion of the evidence may be affirmed on the alternative grounds that (1) Taylor's New Jersey arson conviction was not a crime of violence under § 4-4 (b), and (2) the alleged evidentiary error was harmless.[10]

We need not decide whether the trial court erred in excluding evidence of Taylor's New Jersey arson conviction because we conclude that any evidentiary error was harmless. The defendant's claim is solely evidentiary in nature, and he "bears the burden of demonstrating that the error was harmful." (Internal quotation marks omitted.) *State* v. *Jordan*, 329 Conn. 272, 287–88, 186 A.3d 1 (2018). To satisfy this burden, the defendant must demonstrate that "the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) Id., 288; see also *State* v. *Osimanti*, 299 Conn. 1, 19, 6 A.3d 790 (2010) ("a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict" (internal quotation marks omitted)).

As we explained in *Osimanti*, evidence of a victim's violent criminal record is admissible under § 4-4 (a) (2) of the Connecticut Code of Evidence for two purposes. The first purpose is to demonstrate "the violent, dangerous or turbulent character of the victim to show that the accused had reason to fear serious harm, after laying a proper foundation by adducing evidence that he acted in self-defense and that he was aware of the victim's

---

[10] The state also claims that the defendant's evidentiary claim is not preserved for appellate review because defense counsel failed to object to the trial court's application of § 6-7 (b) of the Connecticut Code of Evidence. We need not address this claim in light of our conclusion that the alleged evidentiary error was harmless.

violent character." (Internal quotation marks omitted.) *State* v. *Osimanti*, supra, 299 Conn. 13. The second purpose is "to prove that the victim was the aggressor, regardless of whether such character evidence had been communicated to the accused prior to the homicide." (Internal quotation marks omitted.) Id., 14. There was no evidence that the defendant was aware of Taylor's arson conviction at the time of the shooting, and, consequently, only the second purpose, to prove that Taylor was the aggressor, is relevant to the present appeal.

On the basis of our thorough examination of the record, we conclude that evidence that Taylor previously had been convicted in New Jersey of the crime of arson would not have substantially swayed the jury's verdict. Although there was evidence that Taylor had threatened Iverson, the defendant, and/or others prior to the shooting, there was no evidence that Taylor was armed with a firearm or deadly weapon or that there were any firearms or deadly weapons in the trunk of the Mercedes-Benz that Taylor could access. Additionally, the video surveillance footage does not support a reasonable inference that Taylor was the aggressor in the shooting. The footage does not depict Taylor making any threatening gestures or approaching the trunk of the Mercedes-Benz with any urgency. Nor does it appear that anyone was trying to escape from Taylor's alleged threats or to flee the scene to avoid an imminent risk of harm.

Against this factual background, we conclude that evidence of Taylor's arson conviction would not have affected the jury's verdict. The facts underlying Taylor's conviction are not reflected in the record, and the crime of arson does not necessarily involve a risk of harm to a person, violent physical conduct, or the use or threatened use of physical force against another.[11] In

[11] In New Jersey, arson is considered a crime against property. See *State* v. *Hill-White*, 456 N.J. Super. 1, 16, 191 A.3d 688 (App. Div. 2018) (concluding "that the [l]egislature deemed arson as an offense against property, the

light of the nature of the offense, we cannot say that it is likely that evidence of Taylor's arson conviction would have impacted the jury's resolution of whether the defendant was acting in self-defense or defense of others when he shot Taylor. Simply put, the fact that Taylor intentionally had set fire to a building or structure at some unknown point in time for some unknown purpose does not make it more likely that he would use a firearm with the intent to kill or to inflict serious bodily injury.

Moreover, evidence of Taylor's arson conviction was tangential at best to the jury's resolution of whether the defendant could have avoided the necessity of using deadly physical force by retreating in complete safety. See *State* v. *Osimanti*, supra, 299 Conn. 21–22 (exclusion of evidence of victim's criminal record was harmless in part because of its "tangential relationship" to "[the] central factual issue" of whether defendant had duty to retreat); see also part I of this opinion. During closing argument, the prosecutor argued that, even if the jury believed that Taylor had threatened to kill the defendant or others, the defendant "could have just left when he heard this threat. He didn't have to keep going. He didn't have to sit there. He could have just left. He could have taken [Iverson] by the arm and said, 'come on, we're out of here. We don't need—nobody needs

gravamen of which is, in general, setting a fire"), cert. denied, 237 N.J. 188, 203 A.3d 904 (2019). Even the most severe category of arson, aggravated arson, does not necessarily require proof that the defendant engaged in conduct that posed a risk of danger to human life or health. See N.J. Stat. Ann. § 2C:17-1 (a) (2) and (5) (West 2015) (defining "aggravated arson" in relevant part as "start[ing] a fire or caus[ing] an explosion, whether on his own property or another's," either "[w]ith the purpose of destroying a building or structure of another" or "[w]ith the purpose of destroying or damaging any forest"). Unlike the crimes of murder and assault, New Jersey's arson statute does not "differentiate the grading and the punishment depending on the degree of harm or attempted harm to [a] victim . . . suggesting that its primary focus is . . . on punishing for the act of setting [a] fire." *State* v. *Hill-White*, supra, 19.

to get shot tonight. We're out of here.' " The prosecutor urged the jury to find that the defendant did not retreat because "he had a gun with him . . . [and] came prepared to do violence." There was abundant evidence to support a factual finding that the defendant had a duty to retreat even if Taylor had been the aggressor during the confrontation. For the foregoing reasons, we conclude that any evidentiary error was not harmful.

The judgment is affirmed.

In this opinion the other justices concurred.