******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* GARRY RAMSEY
### (SC 20852)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder in connection with the stabbing death of the victim, the defendant appealed to this court. At trial, the defendant admitted that he had stabbed the victim during a fight inside the victim's apartment but claimed that he had acted in self-defense. On appeal, the defendant contended that the evidence presented at trial was insufficient to disprove his self-defense claim beyond a reasonable doubt. *Held*:

The state presented sufficient evidence to satisfy its burden of disproving the defendant's claim of self-defense beyond a reasonable doubt, as the jury reasonably could have found, on the basis of the evidence presented, that the defendant either did not actually believe that the victim was using or was about to use deadly physical force against him or that, even if the defendant held that belief, his belief was not objectively reasonable.

The state introduced evidence that contradicted the defense's theory that the defendant had entered the victim's apartment unarmed and at the victim's invitation and that the defendant had inadvertently stabbed the victim only after the victim kicked and attacked the defendant with a knife, and the jury reasonably could have found instead that the defendant had unlawfully entered the victim's apartment in possession of a knife and that he was the only person in possession of a knife during the ensuing tussle.

Argued April 16—officially released July 1, 2025

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *K. Doyle, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Naomi T. Fetterman*, assigned counsel, for the appellant (defendant).

*Raynald A. Carre*, deputy assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Samantha Magnani*, assistant state's

attorney, and *John F. Fahey*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, J. The defendant, Garry Ramsey, was charged with murder, in violation of General Statutes § 53a-54a (a), for fatally stabbing the victim, Robert Callahan. At trial, the defendant admitted that he had stabbed the victim during a fight inside the victim's apartment but claimed that he had acted in self-defense. The jury rejected his justification defense, finding him guilty of murder. In this direct appeal pursuant to General Statutes § 51-199 (b) (3), the defendant claims that the evidence presented at trial was insufficient to disprove his self-defense claim beyond a reasonable doubt. We affirm the judgment of conviction.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. The defendant and the victim knew one another through a mutual acquaintance, Tiffany Menendez. Menendez met the victim in 2010 or 2011, when she was twenty or twenty-one years old. Menendez was a sex worker at that time, and the victim, who was thirty-six years older than Menendez, hired her. Although the victim patronized Menendez for sex, he wanted to help Menendez get sober, and they "bonded over that mostly at first." They became friends and lived together "[o]ff and on" throughout the next ten years. In the weeks preceding the victim's death, Menendez was staying with the victim in Manchester.

Menendez met the defendant, who is twenty-five years older than Menendez, in the early part of 2021, when the defendant picked her up on a street in Hartford and gave her $20 in exchange for oral sex. Menendez continued to see the defendant during the months that followed, and the defendant would provide her with cocaine and fentanyl, take her to get food, and

drive her to see other clients. The defendant would supply Menendez with drugs, though he never used drugs himself. Eventually, the defendant became "controlling" and "aggressive" with Menendez. He would show up uninvited wherever Menendez happened to be and expected her to be available for him at all times. Menendez told the victim that she was "scared at times" because of the defendant's behavior.

Although Menendez saw both the defendant and the victim on a regular basis, there were no issues between the two men. The victim, whom Menendez described as "a very laidback person" who "got along with everybody," never expressed any jealousy toward the defendant. In the months preceding the stabbing, however, the defendant had begun to express jealousy toward the victim, as well as any other man to whom Menendez gave attention.

At 11:57 a.m. on June 5, 2021, Menendez called 911 to report that the victim had been stabbed. Officer Michael Brouillard with the Manchester Police Department was dispatched to the victim's apartment and activated his body camera upon his arrival to record the events as they unfolded. As he approached the building, he saw the victim lying on the front stoop outside his apartment. The victim was having difficulty breathing, and there was a lot of blood on his shirt. Initially, the victim was responsive to Brouillard's questions, communicating that someone was inside the apartment, that he had been stabbed in the chest, and that "Garry" had stabbed him. Shortly after paramedics arrived at 12:03 p.m., however, the victim stopped breathing, and the paramedics were unable to detect a pulse. The victim was pronounced dead upon arrival at Hartford Hospital. Gregory A. Vincent, an associate medical examiner for the state, conducted an autopsy and determined that the victim had died as a result of a laceration to his right ventricle. At the time of his death, the victim was

sixty-eight years old, six feet, two inches tall, and weighed 142 pounds.

While looking for the victim's identification, Brouillard found brass knuckles in one of the pockets of the victim's pants.[1] Subsequent forensic analysis established that the defendant's DNA was not present on the brass knuckles. Brouillard spoke with Menendez for more than one hour while other officers secured the scene, and Menendez was emotional but cooperative. Menendez identified the defendant as the assailant, and a warrant for the defendant's arrest was issued. The defendant contacted an attorney, who arranged for the defendant to turn himself in to the Manchester police on the morning of June 7, 2021. At the time of his arrest, the defendant was fifty-six years old, five feet, six inches tall, and weighed 220 pounds. During the booking process, the defendant did not complain of any injuries, and no injuries were visible on his face, arms, or hands.

The state charged the defendant with murder, and the case proceeded to a jury trial over several days in January and February, 2023. At trial, the state presented testimony from several witnesses, including Menendez, Vincent, Detective Claire Hearn, and Jerome Campbell, an inmate who shared a prison cell with the defendant from August 27 through December 7, 2021. The state also introduced more than eighty exhibits, including photographs of the interior and exterior of the victim's apartment, an evidence analysis report prepared by Hearn, and cell phone records from the victim and Menendez.

---

[1] The defendant notes that Detective Khristopher Slate with the Manchester Police Department testified that a pair of brass knuckles was recovered on the front lawn near the victim. Slate, however, testified that the brass knuckles were on the front lawn when he arrived at the crime scene at 2 a.m. on June 6, 2021, which was after Brouillard found them in the victim's pants pocket.

Menendez testified about the events leading up to the victim's death, and her account aligned with the relevant cell phone records. Menendez testified that, on June 4, 2021, she was with the victim in the victim's van in Hartford when the defendant approached the vehicle and demanded to know what Menendez was doing. Menendez decided to go with the defendant to avoid any problems, but she continued communicating with the victim via text messages.[2] Later that evening, the defendant drove Menendez to the victim's apartment so that she could get clean clothes. When they arrived, Menendez went inside while the defendant waited in his vehicle. While inside the apartment, Menendez texted the defendant: "Yo this guy is geeking out of his fuckin mind he almost just smashed my [face] in with a netka pole with his pants down to his ankles yo wtf." When asked at trial to explain that text message, Menendez testified that "geeking" means that the victim "was high," but she could not explain the rest of the message. Instead, she stated that she was just texting the defendant to keep him from coming inside the victim's apartment. As she was leaving the apartment, Menendez told the victim that she was going to leave with the defendant but would be returning to the apartment at some point. Menendez and the defendant then drove to a hotel in Manchester, where the defendant rented a room for the night. Throughout the night, the defendant provided fentanyl and cocaine to Menendez, and Menendez "was just getting high all night" while the defendant would "pretend that he was sleeping." Menendez felt compelled to remain in the room with the defendant.

---

[2] While she was with the defendant, Menendez sent text messages to the victim, asking the victim to meet her at the defendant's apartment in Hartford and to take her back to the victim's apartment in Manchester. Upon arriving at the defendant's apartment complex, the victim learned that his van had a flat tire. Menendez briefly spoke to the victim in the parking lot but elected to stay with the defendant while the victim used a rideshare service to return to his apartment.

In the early morning hours of June 5, 2021, Menendez told the defendant that she "wanted to get clean" and that she "would have to go away for a little while," but the defendant did not support her decision. The defendant told Menendez that he was going to get more drugs and "wanted to make sure that [she] was going to be there when he got back." At 6:54 a.m., after the defendant left the hotel room, Menendez texted the victim, "I'm in Manchester [at a] hotel wanna pick me up." The victim and Menendez then exchanged several text messages confirming the name of the hotel and the victim's expected arrival time. At 9:04 a.m., the victim texted Menendez that he had arrived at the hotel, but Menendez did not respond until 9:35 a.m. When the victim went into the room, Menendez was "frantic" because she was scared that the defendant was going to return while she was trying to leave. The victim helped Menendez quickly gather her things from around the room, which was a mess, before they left together in the victim's van.

Menendez testified that the victim "could tell something wasn't right. I don't normally act scared like that." Menendez also stated that, "on the way from the [hotel] . . . I was very fearful because I kept telling [the victim] that the defendant was going to come, because of his anger and his rage that he was coming. . . . I knew [that the defendant] was going to be mad because I left the room a mess, and I wasn't there, and I didn't let [the defendant] know. . . . I knew he wasn't going to leave me alone, and I knew he was going to come for me."

The victim drove to his apartment, and he and Menendez talked during the drive about the defendant's anger and attitude toward Menendez. In her interview with a detective at the police station, Menendez recalled that the victim had said, "I'm going to fucking kill him," during the drive from the hotel that morning, though

Menendez explained at trial that the victim was not angry but, rather, "was just trying to make [her] feel better. He didn't have anything against the defendant." After they arrived, Menendez remained fearful that the defendant was going to come to the victim's apartment.

At 10:49 a.m., the defendant texted Menendez, "where are you [do] you want the stuff in the room," but Menendez did not respond. At 11:24 a.m., the defendant texted Menendez again: "They charged me with drug paraphernalia and possession of [n]arcotics," and "why would you do that to me I got [arrested] and [I'm at the] Manchester police station [m]y bond is $35,000 for this room." Menendez did not respond. Around the same time, the victim left his apartment to pick up some food for Menendez and himself. Menendez sent a series of text messages to the victim beginning at 11:25 a.m., in which she provided her lunch order. At 11:31 a.m., the victim texted Menendez that the defendant was outside the victim's apartment. Menendez responded eighteen minutes later at 11:49 a.m. in a series of text messages, asking if the defendant had left and if the victim was okay. The victim texted Menendez, "[h]e may try doing something still," at 11:49 a.m., and "[l]et me know if he comes to the door," at 11:51 a.m.

After seeing the defendant, the victim parked his van on a street located behind his apartment and walked to the back door. At 11:55 a.m., the victim called Menendez and whispered, "hurry up and open the back door." While Menendez was opening the back door for the victim, she heard the defendant banging on the front door. Upon entering, the victim immediately locked the back door and told Menendez to get inside the bedroom, explaining that he would tell the defendant that she was not inside the apartment. Menendez saw the victim heading toward the front door before she went into the bedroom; the victim appeared calm, and he had nothing in his hands. Menendez hid in the bedroom, but she was

not able to close the door completely. Within seconds of entering the bedroom, Menendez heard the front door open and someone try to close the bedroom door. She testified that "the apartment's so small that it was only a second. I didn't hear anybody yelling at each other. All I heard was fighting. They were tussling. . . . I know someone was trying to close the bedroom door before I heard the tussling, and then I heard [the victim] cry out my name. And then he just said, 'ow.' . . . [I]t all happened so quickly. It happened so quickly, and then I just heard him say, 'ah,' like really loud. . . . And then it was quiet." Menendez exited the bedroom and "saw blood everywhere" and the victim struggling to stand near the open front door. The victim fell a couple of times as he struggled to stand, eventually coming to a rest on the front porch. Through the open doorway, Menendez could see the defendant in his car as he drove away "quite quickly."

Although no weapon was recovered at the crime scene, Menendez testified that the defendant kept a folding knife in the driver's side door of his car and that "[t]here's only one time that . . . he took it out, [but] he wasn't threatening me with it. I think it was more for intimidation purposes . . . . He just let me know that he had it."

On cross-examination, after being shown footage from Brouillard's body camera, Menendez acknowledged that she had told Brouillard that the victim "had a crazy look on his face when he came in through the back door . . . ." On redirect, however, she explained that what she had meant was that the victim looked "concerned. He didn't look right. Something was wrong." Although Menendez also admitted during cross-examination that she did not see the altercation between the defendant and the victim, when defense counsel suggested that Menendez therefore did not see who started out with the knife during the altercation,

Menendez stated: "I know what I saw. A split second before the incident occurred . . . I saw [the victim] with no weapons, and he was not angry when he answered that door."

Vincent testified that blunt injuries to the victim's right forearm and upper arm, his left middle finger, and his left forearm and upper arm appeared "fresh" and were consistent with defensive wounds because those areas "would be exposed if somebody is putting their arms up to block something." On cross-examination, Vincent acknowledged that some of the blunt injuries also could be consistent with the victim's falling on the ground or with someone's grabbing the victim's arm as the victim thrust his arm. Vincent also testified regarding the autopsy toxicology report for the victim, which revealed that the victim had cocaine and fentanyl, as well as their respective metabolites, in his system when he died. Based on those results, Vincent testified that the victim had used cocaine and fentanyl within hours of his death, but Vincent was unable to testify how those drugs affected the victim because Vincent did not know the victim's tolerance to those drugs. Vincent did explain that cocaine is a stimulant whereas fentanyl is a depressant, so the two drugs would tend to "cancel each other out a little bit." Menendez previously had testified that the victim would act "goofy" when he was using drugs.

Hearn, who has specialized training in bloodstain analysis, created an evidence analysis report that included rudimentary diagrams of the crime scene indicating where various items and bloodstains had been found and crime scene photographs of that evidence. The apartment consisted of four rooms—a kitchen, living room, bathroom, and bedroom. The living room and bedroom are in the front of the apartment, and the kitchen and bathroom are in the rear; there is a small hallway leading from the living room to the bathroom

and bedroom. The front door opens into the living room, and there was a couch straight ahead, positioned perpendicular to the front door, with its back against the bedroom wall. The back door of the apartment, which opened into the kitchen, was visible from the front doorway. Hearn testified that there were significant bloodstains in the hallway outside of the bedroom and in and around the front doorway, indicating that the victim was bleeding in each location for "more than just a brief moment."

Campbell testified about conversations he had had with the defendant while they were cellmates in 2021. Campbell explained that he had sent a letter addressed to two officers at the Manchester Police Department, Detective Andrew Young, who was the lead detective for the defendant's case, and Sergeant Marc Hughes, who was Young's supervisor. When asked why he had come forward with the information, Campbell responded: "Because I felt bad. . . . I heard how [the defendant had] addressed [the victim] as a crackhead and [Menendez] as a fiend. . . . I felt like . . . you shouldn't die because you're addicted or because you're getting high . . . . I just felt bad. . . . My kids' mother gets high. My brother gets high. His wife. I don't want them to die for just wanting to get high. That's not how it should be." Campbell stated that, although the defendant initially told Campbell that "it was an accident," the defendant eventually admitted that "he had the knife on him" and that he pulled it out during the tussle and stabbed the victim. Campbell specified that the defendant explained that he had stabbed the victim and then "jumped up" to exert more force "until he heard the [victim] gasp for air." On cross-examination, Campbell explained that the defendant had an issue with his foot due to a prior surgery and that the defendant had said that the victim was overpowering him as a result. Defense counsel suggested that Campbell simply had reviewed

the defendant's court papers that would have been in their cell and fabricated his testimony to curry favor with the state, and that Campbell addressed his letter to Detective Young and Sergeant Hughes because he saw their names on search warrants that the defendant kept in their shared cell. Campbell maintained that he testified truthfully.[3]

After the prosecutor concluded the state's case-in-chief, defense counsel moved for a judgment of acquittal, arguing that the state had failed to meet its burden of proving that the defendant had not acted in self-defense when he killed the victim. Specifically, counsel argued that Vincent's testimony was equivocal at best, because Vincent testified that the blunt injuries found on the victim were consistent with defensive injuries "but then conceded that the bruise on [the victim's] arm could have been caused by a motion coming forward with something in [the victim's hand]. That could be interpreted very easily as [the victim] coming forward with a weapon, and [the defendant] having to defend himself and acting in self-defense." In response, the prosecutor argued that, considering the testimony of Menendez and Campbell in conjunction with the physical evidence presented, the evidence was sufficient for the jury to find the defendant guilty of murder or some lesser included offense and to reject his self-defense claim. The court denied the motion, noting that "there are many factual issues in this case as to intent [and] anything related to self-defense."

The defendant proceeded to present his defense. Sydney Luther, a private investigator hired by defense counsel, testified that he had obtained an envelope from the defendant on January 21, 2023, which contained a copy

---

[3] Immediately after Campbell's testimony, the court gave the jury a special credibility instruction on informant testimony, which the court repeated during its final jury charge.

of an affidavit and application for a search warrant for the defendant's apartment in Hartford. The envelope was addressed to the defendant at the Hartford Correctional Center and postmarked June 17, 2021; Detective Young and Sergeant Hughes were the affiants identified on the search warrant. The envelope and a redacted copy of the search warrant were admitted into evidence (exhibit Q1).

The defendant also testified in his own defense. Before presenting his own version of events, the defendant explained that he had physical limitations due to complications from an injury to his foot that "never healed right." On redirect examination, the defendant removed his shoe and sock from his left foot and displayed his bare foot for the jury. He stated that he had an ongoing issue with his left foot and that he was supposed to undergo surgery to correct his hammer toe.

As to his recollection of the morning of June 5, 2021, the defendant testified that he had told Menendez that he was going to return to his apartment to clean up and to check on his son before returning to the hotel. When the defendant returned to the hotel, Menendez was no longer there, and the hotel room "was a disaster." The defendant recounted that Menendez "left needles, condoms, dildos, cigarette ashes, cigarette [butts], [and] blood everywhere. Blood in the bathroom on the wall. . . . She squirted lotion all in the middle of the bed. I don't even know for what reason. The room was a mess, man. I was scared. . . . I was very mad." After Menendez blocked the defendant's phone call, he sent her text messages in which he lied about being arrested in an effort "to get her attention." After leaving the hotel, the defendant drove to the victim's apartment "to have an argument" with Menendez because he "was mad."

When the defendant arrived at the victim's apartment, the victim was sitting in his van in front of the apart-

ment, and the defendant asked the victim if Menendez was with him. The victim denied that Menendez was with him, and the defendant asked if the victim would give Menendez "her stuff" that she left in the hotel room. The defendant recalled that, during this interaction, the victim talked about his wife and his relapse after fifteen years of sobriety. After the defendant put Menendez' stuff in the back of the victim's van, the victim drove away, and the defendant left immediately after him. After a short distance, however, the defendant turned around and drove back to the victim's apartment because he "knew [that the victim] was lying because [there was] no way [that Menendez] could not be there." Surveillance footage from a car wash located near the victim's apartment showed the defendant driving away from the victim's apartment at 11:49 a.m. and driving back toward the victim's apartment at 11:52 a.m.

Upon his return, the defendant parked his car in front of the victim's apartment and left the engine running while he went to the door to confront Menendez. The defendant testified: "I just wanted to let [Menendez] know [that] I was not satisfied. Why did she do that? I was mad. . . . I get to the door. I knock on it, twice. Then, I knocked another time, twice. And, as I started to walk away, [the victim] cracked the door. He opened the door. . . . I said to [the victim], 'come on, I need to speak with [Menendez], please. You know, she did something foul, and I'm not happy about it.' . . . [The victim] opened the door wide open. He stood [to] the side of the door, [gestured with his arm] and said, 'she's not here, look.' . . . I took that as, okay, maybe I can go in and look. . . . I walk into the house. I'm walking [toward] the kitchen and the back door, and I see a hallway on the right side. And, as I get a little past the couch and [am] about to turn to the bedroom, [the victim] kicked me. . . . He kicked me in my leg. My left leg.

\* \* \*

"[I] fell on my knees. . . . I get up. I turn around, and he's coming at me. And he had a knife in his hand. . . . He tried to poke me. I got out of the way. I grabbed him. We [were] tussling. I get him to drop the knife. Then, I pick it up. And he's coming toward me, and he got jabbed in the chest. . . . When he got stabbed, I pulled the knife. It happened so fast. It was just like a jab. He staggered back, and blood started pouring [out]. And I walked out of the door real fast because I was scared at this point. . . . And then he came out after me. . . . This guy just tried to kill me. I'm scared. I'm nervous. I'm like freaking out. . . . I [drove] to Hartford. . . . On the way to the highway, I threw [the knife] out. . . . It was like a paring knife. It was silver grey with a black handle." The defendant denied carrying a knife in his car, and he denied that Menendez had seen him with any kind of folding knife.

The defendant further testified that he drove to Keney Park in Hartford immediately after the stabbing. He then visited family in Hartford and West Hartford before paying his rent and returning to his apartment in Hartford, where his cousin picked him up and drove him back to West Hartford.

On cross-examination, the defendant insisted that he was polite with the victim and was "showing no aggression." Although the defendant admitted that he had stabbed the victim in the heart, he claimed that he did not do it intentionally. When the prosecutor asked the defendant about Campbell's testimony, the defendant denied that he had shared any details of the incident with Campbell and suggested that Campbell had made up a story based on information he read in exhibit Q1. The prosecutor also asked the defendant about his conduct after the stabbing, and the defendant acknowledged that he not only failed to contact the police or

emergency medical services after stabbing the victim, but that he also fled the scene, disposed of the knife, and cleaned his car immediately after the incident.

After the close of evidence, the court held a charging conference on the record. Defense counsel requested a self-defense charge, and the parties agreed that the court should instruct the jury on self-defense, including its four components and two of its statutory exceptions—the duty to retreat and initial aggressor.

During closing argument, the prosecutor argued that the victim died while preventing the defendant from getting into the bedroom, where Menendez "was hiding from the defendant in his enraged state." The prosecutor argued that "[t]he only dispute is whether the defendant brought a knife to [the victim's] apartment." In that regard, she argued that, "[i]f [the victim] had a knife that day, he wouldn't have kicked the defendant. . . . [T]he defendant wouldn't even have gotten in the front door . . . the defendant would've run back to his car. That's how you know [that the victim] didn't have the knife that day. Look at [the victim]. Look at his hip bone. [The victim] weighed 140 pounds. The defendant could've broken him in half with his bare hands. He was 100 pounds heavier, 12 years younger, and in a lot better health than [the victim]." The prosecutor emphasized the testimony of Menendez and Campbell that the defendant kept a knife in his car and that he brought a knife with him into the victim's apartment. Last, the prosecutor argued that the defendant's claim of self-defense also failed because he had a duty to retreat and because he was the initial aggressor. She argued that "there were so many opportunities" for the defendant to retreat, "[b]ut he kept escalating it," and that the defendant was the initial aggressor "because he went up to the door, because he forced his way in," and "[b]ecause he took the weapon . . . ."

For his part, defense counsel argued that the victim was under the influence of cocaine and fentanyl and was not thinking rationally. He rejected the prosecutor's description of the victim, asserting that the victim worked in construction every day, had brass knuckles in his pocket, and was "physically able to swing a knife with bad intentions . . . ." Defense counsel recounted the defendant's version of the incident, stating that the defendant "went into a house that we now know was a hornet's nest because of what was going [on] inside [the victim's] head and his body. And [the defendant] testifie[d] [that] he gets kicked in the back of the leg, and he goes down. And a man takes a knife and tries to kill him." He argued that the victim was "high on cocaine," that he was "frantic" when he came through the back door, and that he recently said, "I'm going to f-ing kill [the defendant]. . . . Again, the threshold question is, what evidence disproves beyond a reasonable doubt that [it] could've happened this way . . . ."

During rebuttal argument, the prosecutor reiterated that the defendant's self-defense claim failed because of the statutory exceptions to self-defense. The prosecutor also argued that the defendant's version of events was implausible because the evidence established that the victim was protecting Menendez and, therefore, would not have invited the defendant inside of the apartment. She further argued that the defendant grabbed the knife from his car before he went inside the apartment and "got rid of the knife after [killing the victim]. And, again, he doesn't get to benefit from the fact that he threw the murder weapon out, so that the state wasn't able to determine whose DNA was on that knife." Finally, the prosecutor argued that the defendant used deadly physical force when he "took the knife and chose where to stab [the victim]. The location of the wound, the weapon that was used—that's deadly physical force. Look at the defendant's intent. Again, if all he wanted

to do was injure [the victim] that day, he could've stabbed him in the leg. He could've stabbed him in the arm. He could've stabbed him in the head. The location of the wound is another way you know that it didn't happen the way the defendant is describing to you. It didn't happen during a violent tussle. . . . I submit to you that, if anybody was acting in self-defense that day, it was [the victim]. He was defending himself. He was defending . . . Menendez. The defendant overpowered him. The defendant burst [into] his house, and the defendant stabbed him in the heart."

The court instructed the jury at the end of the day on February 6, 2021, and the jury began deliberations the following day. During its deliberations, the jury submitted a note asking to review exhibit Q1 and Campbell's testimony. The court called the jury into the courtroom to address the note, and the jury foreperson explained that the jury needed to review the requested exhibit before hearing Campbell's testimony. Less than one hour later, the jury asked to listen to the entirety of Campbell's testimony, which spanned approximately twenty-seven minutes. After the recording was played for the jury, the jury deliberated for an additional two and one-half hours before finding the defendant guilty of murder. The court rendered judgment in accordance with the jury's verdict and sentenced the defendant to a total effective sentence of thirty-five years of incarceration. This appeal followed.

Before addressing the defendant's claim, we set forth the relevant legal principles regarding self-defense. General Statutes § 53a-19 (a) provides: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for

such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

"It is well settled that under § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack." (Internal quotation marks omitted.) *State* v. *O'Bryan*, 318 Conn. 621, 632, 123 A.3d 398 (2015). "Deadly physical force" is defined as "physical force which can be reasonably expected to cause death or serious physical injury . . . ." General Statutes § 53a-3 (5). The statute requires that the defendant subjectively held both of the required beliefs and that those beliefs were objectively reasonable. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 398–99, 267 A.3d 81 (2021); *State* v. *O'Bryan*, supra, 632.

Accordingly, the statute imposes four conditions for the use of deadly physical force to be justified as self-defense: "(1) the defendant must actually have believed that the victim was using or was about to use physical force against him [or others], (2) a reasonable person, viewing all the circumstances from the defendant's point of view, would have shared that belief, (3) the defendant must actually have believed that the degree of force he used was necessary for defending himself . . . [or others], and (4) a reasonable person, viewing all the circumstances from the defendant's point of view, also would have shared that belief." (Internal quotation marks omitted.) *State* v. *Johnson*, 351 Conn. 53, 61, 328 A.3d 143 (2025).

The duty to retreat and initial aggressor exceptions to self-defense are set forth in subsections (b) and (c)

of § 53a-19. Under § 53a-19 (b) (1), "a person is not justified in using deadly physical force upon another person if he or she knows that he or she can avoid the necessity of using such force with complete safety . . . by retreating, except that the actor shall not be required to retreat if he or she is in his or her dwelling . . . or place of work and was not the initial aggressor . . . ." Under § 53a-19 (c) (2), "a person is not justified in using physical force when . . . he is the initial aggressor . . . ."

Self-defense is a justification defense—not an affirmative defense. See General Statutes § 53a-16; see also, e.g., *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). Accordingly, when a defendant has introduced sufficient evidence to warrant presenting the claim to the jury, "[t]he state bears the burden of disproving the defendant's [claim of self-defense] beyond a reasonable doubt. . . . To sustain its burden, the state must disprove beyond a reasonable doubt any of the components of [self-defense] or establish beyond a reasonable doubt that any of the statutory exceptions . . . codified [at] § 53a-19 (b) and (c) applied." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 351 Conn. 62.

We have held that, in the ordinary case, a jury is not required to be unanimous as to each component of the defendant's claim of self-defense. See *State* v. *Mekoshvili*, 344 Conn. 673, 685, 280 A.3d 388 (2022). We explained that statutory components "are not independently essential elements of a self-defense justification defense that must each be disproven. . . . Rather, [they] are more accurately understood as merely triggering circumstances . . . or factors relevant to a determination [of] whether the defendant acted in self-defense." (Citations omitted; internal quotation marks omitted.) Id., 686. For that reason, a jury "need not agree

as to the specific factors or triggering circumstances by which [the state] disproves a claim of self-defense. . . . [O]nce the state has successfully convinced the entire jury that the essence of a self-defense justification is lacking, that is, that the defendant's acts of violence were not a reasonable and justified use of physical force, the constitution does not require jurors to agree on why, specifically, the defendant's choice to engage in otherwise criminal conduct was not reasonable."[4] (Citations omitted; footnote omitted.) Id., 686–87.

On appeal, the defendant's sole claim is that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that the duty to retreat and initial aggressor exceptions to self-defense applied. Specifically, he claims that the state failed to present sufficient evidence to prove that the defendant "knew he could retreat from the apartment to complete safety" and that he was the initial aggressor in the fight. The state responds that the evidence was sufficient (1) to disprove beyond a reasonable doubt that the defendant reasonably believed that the victim was using or about to use deadly physical force against him and that deadly physical force was necessary to repel the victim, or (2) to establish beyond a reasonable doubt that the defendant had a duty to retreat or was the initial aggressor. We conclude that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant did not reasonably believe that the victim was using physical force against him or that his use of deadly physical force was necessary to repel the victim. As a result, we need not consider whether the state

---

[4] Although a specific unanimity decision is not constitutionally required; see, e.g., *State* v. *Mekoshvili*, supra, 344 Conn. 685; the trial court instructed the jury that (1) "you must find that the defendant did not act in self-defense if you *unanimously* find" that the state disproved any of the four statutory components of the defendant's self-defense claim, and (2) "[y]ou may reject the self-defense claim on the basis of one of [the] statutory disqualifications only if the state proves that disqualification beyond a reasonable doubt to your *unanimous* satisfaction." (Emphasis added.)

also proved beyond a reasonable doubt that a statutory exception to self-defense applied.[5]

---

[5] Although, on appeal, the defendant focuses on the prosecutor's closing and rebuttal arguments that the defendant's self-defense claim failed because he had a duty to retreat and because he was the initial aggressor, the prosecutor also argued that the defendant's account simply was not credible and that the defendant was the only person with a knife during the incident. She emphasized that the defendant "was 100 pounds heavier, 12 years younger, and in a lot better health than [the victim]," that he "could've broken [the victim] in half with his bare hands," and that he "could've stabbed [the victim] in the arm . . . [or] the head." Thus, the state in no way conceded the four statutory components of self-defense.

More important, the trial court properly instructed the jury as to each of the four components of self-defense, in addition to those two exceptions, and defense counsel expressly agreed to those instructions. Specifically, the court instructed the jury: "[Y]ou must find that the defendant did not act in self-defense if you unanimously find any of the following:

"(1) The state has proved beyond a reasonable doubt that, when the defendant used physical force, he did not actually believe that [the victim] was using or about to use physical force against him. If you have found that the force used by the defendant was deadly physical force, then the state must prove that the defendant did not actually believe that [the victim] . . . was using or about to use deadly physical force against him, or . . . was inflicting or about to inflict great bodily harm [on] him, or

"(2) the state has proved beyond a reasonable doubt that the defendant's actual belief concerning the degree of force being or about to be used against him by [the victim] was unreasonable in the sense that a reasonable person, viewing all the circumstances from the defendant's point of view, would not have shared that belief, or

"(3) the state has proved beyond a reasonable doubt that, when the defendant used physical force on [the victim], he did not actually believe that the degree of force he used was necessary for that purpose. Here again, as with the first requirement, an actual belief is an honest, sincere belief, or

"(4) the state has proved beyond a reasonable doubt that, if the defendant did actually believe that the degree of force he used against [the victim] was necessary for that purpose, that belief was unreasonable in the sense that a reasonable person, viewing all the circumstances from the defendant's point of view, would not have shared that belief. . . .

"The state can also disprove the defendant's claim of self-defense by proving beyond a reasonable doubt any one of the following circumstances or statutory disqualifications to self-defense. . . . [First] a person is not justified in using any degree of physical force in self-defense against another . . . when he is the initial aggressor in the encounter with the other person and he does not both withdraw from the encounter and also effectively communicate his intent to withdraw before using the physical force in question. . . . [Second] a person is not justified in using deadly physical force [on] another person if he knows that he can avoid the necessity of using such force with complete safety by retreating.

"The standard of review governing a challenge to the sufficiency of the evidence to defeat a claim of self-defense . . . is the same [as the] standard used when examining claims of insufficiency of the evidence. . . . First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 351 Conn. 62–63.

* * *

"[T]he defendant has no burden whatsoever to prove [either] of these two statutory disqualifications to the self-defense rule. You may reject the self-defense claim on the basis of one of these statutory disqualifications only if the state proves that disqualification beyond a reasonable doubt to your unanimous satisfaction. . . .

"If you determine that the state has proven each of the elements of the charge of murder, then and only then will [you] consider the issue of self-defense. If you further unanimously find that the state has disproved beyond a reasonable doubt one of the four elements of self-defense, you must find the defendant guilty of the charged crime of murder. If you find that [the] state has not disproved beyond a reasonable doubt any one of the four elements of self-defense, then you must decide if the state has proved beyond a reasonable doubt one of the two statutory disqualifications. If you unanimously find that the state has proved beyond a reasonable doubt [either] of the two statutory disqualifications, then you must find the defendant guilty of the charged crime of murder."

Accordingly, because there is no question that the disputed issue of the reasonableness of the defendant's use of deadly physical force was presented to the jury, it is appropriate to consider whether the jury reasonably could have found the evidence sufficient to conclude that the state met its burden of disproving the defendant's claim of self-defense. But cf. *State* v. *Johnson*, supra, 351 Conn. 61 n.3 (because trial court did not instruct jury on initial aggressor exception, this court had "no basis for determining whether the jury reasonably could have found the evidence sufficient to reject the defendant's justification defenses under [that] alternative legal theory"). During oral argument before this court, counsel for the defendant conceded this point, acknowledging that the court's instructions were not limited to the statutory exceptions to self-defense.

In reviewing the sufficiency of the evidence, "[w]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty. . . . [I]t does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . Thus, in the present case, we construe the evidence and all the reasonable inferences drawn therefrom in the light most favorable to supporting the jury's rejection of the defendant's defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Hughes*, supra, 341 Conn. 398.

We begin our analysis with the theory of defense at trial. The defendant claimed that he was not carrying a knife, that the victim appeared to invite him into the apartment to look for Menendez, that the victim kicked him and then attacked him with a knife, that he was able to disarm the victim and to take hold of the knife, and that he unintentionally stabbed the victim in his chest during the tussle. On appeal, the defendant argues that this is not a case in which mutually exclusive narratives were presented to the jury. According to the defendant, "[t]he *only* narrative presented to the jury regarding the altercation was that of [the defendant]. Despite being present in the apartment . . . [Menendez] did not witness the altercation." (Emphasis in original.) Although we agree with the defendant that the jury was not free to merely disbelieve his account and to conclude that the opposite of what he said was true, "the jury may reject his self-defense claim if other evidence and reasonable inferences drawn therefrom undermine the credibility of his account." *State* v. *Hughes*, supra, 341 Conn. 401.

In the present case, the state introduced evidence that contradicted the defendant's account of being

invited into the victim's apartment and being attacked by the victim with a knife in his hand. On the basis of Menendez' testimony that the victim intended to tell the defendant that she was not in the apartment, that she heard the men fighting within seconds of the victim opening the front door, and that she never heard any conversation or yelling before the fighting began, the jury reasonably could have found not credible the defendant's testimony that he entered the apartment with peaceable intentions and at the victim's invitation, before being attacked from behind by the victim.

Most notable, the state's evidence directly contradicted the defendant's testimony that the victim was armed with a knife. Campbell testified that the defendant admitted that he brought the knife into the victim's apartment, that he pulled it out during a "tussle," and that he intentionally thrust the knife into the victim's chest until he heard the victim "gasp for air." Menendez' testimony likewise contradicted the defendant's account on this significant point, as she not only testified that the victim was calm and had nothing in his hands only seconds before the fighting began, but also that the defendant kept a folding knife in the driver's side door of his car. In fact, on the basis of the defendant's own testimony that he discarded the knife as he drove away from the victim's apartment, the jury also reasonably could have inferred that the knife belonged to the defendant and that he intended to avoid prosecution for conduct he knew was wrongful by disposing of it. See, e.g., *State* v. *Hughes*, supra, 341 Conn. 403–404 ("[i]n the self-defense context . . . [consciousness of guilt] evidence tend[s] to show that the defendant believed that what he had done was not merely an act of self-defense, but [was] something that was considered wrong in the eyes of the law" (internal quotation marks omitted)). Finally, Vincent's testimony regarding the victim's injuries, which included several bruises and abrasions that were consistent with defensive wounds, coupled with the

evidence establishing that the defendant did not complain of any injuries at the time of his arrest and that no injuries were visible on his face, arms, or hands, supports the reasonable inference that the victim did not attack the defendant with a knife.

Construing this evidence in the light most favorable to sustaining the verdict, the jury reasonably could have found that the defendant unlawfully entered the victim's apartment in possession of a knife and that the defendant was the only person in possession of a knife during the tussle. Considering these facts together with the evidence establishing that the defendant was nearly eighty pounds heavier and more than ten years younger than the victim, the jury reasonably could have found beyond a reasonable doubt either that the defendant did not actually believe that the victim was using or was about to use deadly physical force against him or that, even if the defendant held that belief, his belief was not objectively reasonable.[6] In addition, even if the

---

[6] In his appellate briefs, the defendant repeatedly highlights certain evidence that supported his account of being attacked by the victim, namely, Menendez' statements to the police that the victim "had a crazy look on his face" when he came in the back door and that the victim said he was going to "f-ing kill" the defendant hours before the stabbing, and the brass knuckles found in the victim's pants pocket. To be sure, such evidence could support a reasonable inference that bolstered the defendant's self-defense claim. Nevertheless, "the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier [of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . . [W]e do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Citation omitted; internal quotation marks omitted.) *State* v. *Hughes*, supra, 341 Conn. 398. Furthermore, the defendant's recitation of evidence that supports his claim of self-defense omits certain key facts. First, Menendez clarified her statements to the police regarding the victim, explaining that the victim looked "concerned" rather than "crazy" and that the victim was trying to make her "feel better" when he said he was going to kill the defendant. Second, although the victim had brass knuckles in his pocket, there was no evidence that the victim removed them at any point during the encounter with the defendant. In particular, the defendant never claimed that he saw brass knuckles during the encounter.

jury had a reasonable doubt as to whether the victim had kicked the defendant, it reasonably could have found beyond a reasonable doubt that the defendant did not actually believe that deadly force was required to repel the victim or that, even if the defendant believed that deadly force was necessary, that belief was an unreasonable one. See, e.g., *State* v. *O'Bryan*, supra, 318 Conn. 632–33 ("if a jury determines that the defendant's honest belief that he had needed to use deadly force, instead of some lesser degree of force, was not a reasonable belief, the defendant is not entitled to the protection of § 53a-19" (internal quotation marks omitted)). Consequently, because there was sufficient evidence to disprove beyond a reasonable doubt the components of the defendant's self-defense claim, the state met its burden of disproving his justification defense.

The judgment is affirmed.

In this opinion the other justices concurred.