******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KIYON MATHENEY (SC 20987)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of intentional manslaughter in the first degree with a firearm, among other crimes, in connection with the shooting death of the victim, the defendant appealed to this court. After following the victim in his vehicle for a short distance, the defendant approached the driver's side of the victim's parked vehicle, exchanged insults with the victim, and then reached into the vehicle to grab a BB gun that the victim had with him. After a struggle during which the victim regained possession of the BB gun, the defendant drew his own gun and shot the victim. At trial, the defendant asserted a claim of self-defense. In response, the state argued, inter alia, that the defendant's self-defense claim failed because he did not reasonably believe that he faced the imminent use of physical force and because, under the circumstances of this case, the defendant was disqualified by statute (§ 53a-19 (b) and (c)) from claiming that self-defense justified his actions insofar as he had a duty to retreat, had provoked the victim, and had been the initial aggressor. On appeal, the defendant claimed, inter alia, that the trial court had erred when it failed to instruct the jurors that they must agree unanimously as to which specific statutory disqualification to self-defense the state established under § 53a-19 (b) or (c). *Held*:

The defendant could not prevail on his unpreserved claim that the trial court had violated his constitutional right to a unanimous verdict by failing to instruct the jury that, in order to reject the defendant's claim of self-defense, it must unanimously agree as to which specific disqualification under § 53a-19 (b) or (c) the state had established.

Relying on its reasoning in *State* v. *Mekoshvili* (344 Conn. 673), in which the court held that there is generally no constitutional requirement that a jury be unanimous as to which of the specific components of a defendant's self-defense claim the state has disproven in order for the state to overcome that self-defense claim, this court held in the present case that, in general, so long as the jurors unanimously agree that the state has established a statutory disqualification to the assertion of a claim of self-defense, the federal constitution does not require them to be unanimous as to the particular statutory disqualification or disqualifications the state has established.

Contrary to the defendant's claim, the trial court did not lead the jury to believe that only the defendant, and not the victim, could be the initial aggressor when it instructed the jury on the law of self-defense, as the court's instructions, as a whole, made abundantly clear that the victim could have been the initial aggressor.

The defendant could not prevail on his unpreserved claim that the trial court's charge failed to inform the jury that it could not find him to be the initial aggressor on the basis of his words alone and that this omission caused the jury to believe that the defendant was the initial aggressor simply because the defendant had initiated a verbal confrontation with the victim, as there was no suggestion by the court in its instructions, or by the state during the trial, that the person who was the initial aggressor had threatened the other person on the basis of words alone.

There was no merit to the defendant's unpreserved claim that the trial court had misled the jury as to the state of mind required to find him guilty of certain recklessness-based lesser included offenses of murder because of the trial court's instructional summary document, which informed the jury in what sequence it should "deliberate" with respect to the recklessness-based lesser included offenses, as there was no reasonable possibility that the jury misconstrued the verb "deliberate" in that document as an adjective meaning "intentional," especially in light of the trial court's clear, concise, and complete verbal instructions on the recklessness-based offenses.

The state presented sufficient evidence to satisfy its burden of disproving the defendant's claim of self-defense beyond a reasonable doubt, as the jury reasonably could have found, on the basis of the evidence presented, that the defendant did not actually or reasonably believe that the victim was using or was about to use deadly physical force against him, or was inflicting or about to inflict great bodily harm, or that deadly physical force was necessary to defend himself.

The evidence was sufficient to establish that the defendant had acted with the specific intent necessary to support his conviction of intentional manslaughter in the first degree with a firearm, as the jury reasonably could have found that he had intended to cause serious physical injury to the victim in view of the eyewitness testimony and the fact that the defendant had shot the victim at close range.

Argued October 30, 2025—officially released February 17, 2026

*Procedural History*

Substitute information charging the defendant with the crimes of murder, carrying a pistol or revolver without a permit, and criminal possession of a firearm, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Vitale, J.*; verdict and judgment of guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm, carrying a pistol or revolver without a permit,

and criminal possession of a firearm, from which the defendant appealed to this court. *Affirmed*.

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Alexander Beck* and *Charles Johnson*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MULLINS, C. J. The principal issue in this appeal is whether, when the state raises multiple statutory disqualifications in response to a criminal defendant's claim of self-defense, the sixth and fourteenth amendments to the United States constitution require that the jury unanimously agree on a specific statutory disqualification proved by the state. See General Statutes § 53a-19 (b) and (c) (enumerating disqualifications). Consistent with the reasoning in our decision in *State* v. *Mekoshvili*, 344 Conn. 673, 685–88, 280 A.3d 388 (2022), we hold that, in the ordinary case, so long as the jurors unanimously agree that the state has disproven the defense of self-defense beyond a reasonable doubt, the federal constitution does not require them to be unanimous on the particular statutory disqualification the state has proven.

A jury found the defendant, Kiyon Matheney, not guilty of murder and guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55a (a) and 53a-55 (a) (1). The jury also found the defendant guilty of carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 2021) § 29-35 (a), and criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1) (A).

In this direct appeal, pursuant to General Statutes § 51-199 (b) (3), the defendant raises the following three claims, challenging only his conviction of intentional

manslaughter in the first degree with a firearm: **(1)** the trial court deprived the defendant of his constitutional right to a unanimous jury verdict because it failed to provide a specific unanimity instruction with respect to the individual statutory disqualifications from asserting a claim of self-defense (statutory disqualifications to self-defense), **(2)** the trial court improperly instructed the jury on the initial aggressor statutory disqualification to self-defense and on the recklessness-based lesser included homicide offenses, and **(3)** the state did not present sufficient evidence to disprove his claim of self-defense or to establish his guilt. We reject all three of the defendant's claims and affirm the judgment of conviction.

The jury reasonably could have found the following facts. On July 3, 2022, seventeen year old John Tubac-Saquil (victim) drove his girlfriend, eighteen year old Adriana Carreno Sanchez, in his silver Ford truck to Sanchez' home on Poplar Street in New Haven. On the way, the victim drove down Fillmore Street. Gathered on the sidewalk was a group of about twenty to thirty people, among whom was the defendant. When the victim's truck was about thirty to fifty feet away from the group, the victim accelerated, causing the truck's muffler to emit a loud, startling noise. The noise frightened both Sanchez and the people gathered outside. Shortly thereafter, the defendant entered his gray Acura sedan with a passenger and followed the victim's truck.

The victim drove a short additional distance before parking on the left-hand side of Poplar Street, just past the intersection with Pine Street. He removed his BB gun from the center console and placed it on the dashboard on the driver's side of the truck. About two minutes after the victim parked his truck, the defendant pulled his car next to the passenger side of the truck. The defendant stared into the truck, looking to see whether there was anybody inside. Sanchez asked the victim, "why is this guy looking at us?" The victim responded, "let him just leave."

After he stared into the victim's truck for about fifteen to twenty seconds, the defendant backed his car away from the truck and drove back to Fillmore Street. He then parked his car on Fillmore Street, put on a black ski mask, and returned to the corner of Poplar and Pine Streets on foot, with another individual following him. The defendant approached the driver's side of the victim's truck and said, "you were the fucking guy that was racing in front of . . . my house." The victim asked, "what are you talking about?" The defendant anxiously stepped side to side and asked, "are you the fucking guy that raced past my house?" The victim and the defendant proceeded to hurl insults back and forth, and the verbal exchange escalated.

Eventually, the defendant put both his hands on the outside of his right pants pocket and said, "I'm getting ready to shoot." The victim asked: "[W]hat? You're ready for what?" The defendant repeated, "I'm ready to shoot." The victim then slowly reached with his right hand toward the dashboard and grabbed his BB gun. The defendant reached with his arm into the victim's truck, through the partially open window, and attempted to take the BB gun away from the victim. A fight for possession of the BB gun ensued, during which Sanchez repeatedly yelled, "[i]t's a fake gun!" The defendant ultimately failed to obtain possession of the BB gun. After the struggle for the BB gun ended, Sanchez saw that the BB gun was on the dashboard of the victim's truck and that the victim had "his hands up . . . ."

The defendant took two steps back, pulled a gun out of his pocket, and pointed it at Sanchez and then at the victim. The defendant fired four shots in their direction. The first shot hit the victim's left eye, and the victim fell into Sanchez' lap. The defendant, and the other individual who accompanied him, immediately ran back to Fillmore Street. Several days later, the victim died of complications from the gunshot wound.

At trial, the defendant raised a claim of self-defense and testified on his own behalf. During his testimony,

the defendant admitted that, after he failed to gain possession of the BB gun, he wildly fired shots from his own gun toward the truck and immediately fled the scene. The defendant claimed that he believed that the victim was going to try to shoot him and that he fired in an attempt to startle the victim and to allow himself time to escape.

The jury rejected the defendant's self-defense claim. It returned a verdict, finding the defendant not guilty of murder but guilty of the lesser included offense of intentional manslaughter in the first degree with a firearm, as well as carrying a pistol or revolver without a permit and criminal possession of a firearm. The trial court subsequently sentenced the defendant to a total effective sentence of thirty-three years of imprisonment. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

We first address the defendant's unanimity claim. For the first time on appeal, the defendant claims that the trial court violated his constitutional right to a unanimous verdict by failing to instruct the jury that, in order to reject the defendant's claim of self-defense, it must unanimously agree as to which specific statutory disqualification to self-defense the state has proven. The defendant acknowledges that his counsel did not object during trial to the court's failure to provide a specific unanimity charge, and the defendant thus concedes that his claim is unpreserved. He seeks review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[1]

In Connecticut, once a criminal defendant raises the justification defense of self-defense, the state must

[1] Pursuant to *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless

disprove that defense beyond a reasonable doubt in order to secure a conviction. See, e.g., *State* v. *Johnson*, 351 Conn. 53, 62, 328 A.3d 143 (2025) ("[t]he state bears the burden of disproving the defendant's justification defenses beyond a reasonable doubt"). The state may attempt to do so by disproving any of the four components that comprise the defense of self-defense or by demonstrating that one or more of the statutory disqualifications outlined in §53a-19 (b) and (c) apply to the defendant's conduct. See, e.g., id. The components that "must exist for an act of violence to be justified on the [ground] of self-defense . . . [are] (1) the defendant must actually have believed that the victim was using or was about to use physical force against him . . . (2) a reasonable person, viewing all the circumstances from the defendant's point of view, would have shared that belief, (3) the defendant must actually have believed that the degree of force he used was necessary for defending himself . . . and (4) a reasonable person, viewing all the circumstances from the defendant's point of view, also would have shared that belief." (Internal quotation marks omitted.) Id., 61; see also General Statutes §53a-19 (a). The statutory disqualifications under §53a-19 (b) and (c) outline specific circumstances in which a defendant is statutorily disqualified from claiming that self-defense justified his actions. In this case, the prosecutors raised three statutory disqualifications: the duty to retreat disqualification; see General Statutes §53a-19 (b) (1); the provocation disqualification; see General Statutes §53a-19 (c) (1); and the initial aggressor disqualification. See General Statutes §53a-19 (c) (2). We have previously explained that, if the state proves that any of the statutory disqualifications apply, it satisfies its burden of disproving the defendant's claim of self-defense. See *State* v. *Johnson*, supra, 62

error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, supra, 317 Conn. 781 (modifying third prong of *Golding*).

In *State* v. *Mekoshvili*, supra, 344 Conn. 673, this court explained that there is generally no constitutional requirement that the jury be unanimous as to which of the specific components of a defendant's self-defense claim the state has disproven in order for the state to overcome a claim of self-defense. See id., 685. The issue in the present case is whether our reasoning in *Mekoshvili* extends to the statutory disqualifications to self-defense, such that the jury may reject a claim of self-defense without unanimous agreement as to at least one specific disqualification found to apply.

The defendant contends that *Mekoshvili* is not controlling in this case because our reasoning in that decision was limited to whether juror unanimity is required as to the components of a self-defense claim. He asserts that the statutory disqualifications under § 53a-19 (b) and (c) present unique issues of unanimity and that, unlike the components of a self-defense claim, the federal constitution requires the jury to unanimously agree on which disqualification the state has proven. We disagree and conclude that our reasoning in *Mekoshvili* extends to the statutory disqualifications under § 53a-19 (b) and (c) and resolves the defendant's claim. Thus, the defendant's claim fails under the third prong of *Golding* because he was not constitutionally entitled to a specific unanimity instruction on the statutory disqualifications under § 53a-19 (b) and (c).[2]

The following procedural history is relevant to the defendant's claim. At trial, the prosecutors argued to the jury that the defendant could not claim self-defense because any one of three statutory disqualifications to self-defense applied.[3] Ultimately, the trial court

---

[2] Relying on *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), the state also argues that defense counsel implicitly waived the defendant's right to challenge the jury instructions on appeal; see id., 482–83; and, therefore, the defendant cannot establish a constitutional violation under *Golding*'s third prong. See id., 467. We do not address that argument because we conclude that the defendant's claim fails on the merits.

[3] In addition, the prosecutors argued to the jury that the defendant's self-defense claim failed because he did not reasonably believe that he faced the imminent use of physical force.

instructed the jury on the law of self-defense, including the three raised statutory disqualifications, largely in accordance with our state's model jury charge. See Connecticut Criminal Jury Instructions 2.8-1, 2.8-2, 2.8-3 and 2.11-3, available at https://www.jud.ct.gov/ JI/Criminal/Criminal.pdf (last visited February 10, 2026). Specifically, as relevant to this claim, the court instructed the jury that the state "can defeat the defense of self-defense either by disproving any one of the components of self-defense beyond a reasonable doubt to your . . . unanimous satisfaction or by proving beyond a reasonable doubt any of the statutory disqualifications on which I've instructed you to your unanimous satisfaction."[4] See Connecticut Criminal Jury Instructions 2.8-1, supra.

Well established legal principles guide our analysis of the defendant's claim. "An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . The constitutional requirements that inform those instructions are a matter of law that we review de novo." (Citation omitted; internal quotation marks omitted.) *State* v. *Mekoshvili*, supra, 344 Conn. 680–81.

Under the sixth and fourteenth amendments to the federal constitution, every criminal defendant has a constitutional right to a unanimous verdict. See, e.g., *Ramos* v. *Louisiana*, 590 U.S. 83, 93, 140 S. Ct. 1390, 206 L. Ed. 2d 583 (2020). "Before a defendant may be found guilty of a criminal offense," the jury must unanimously agree "that the state has established each element

---

[4] We note that this instruction could reasonably be read to suggest that jurors must unanimously agree on either the specific component of self-defense the state disproved or the specific statutory disqualification the state proved. Thus, the trial court's instruction could be understood to have provided the defendant with the substance of what a specific unanimity charge would entail.

of the charged crime beyond a reasonable doubt." *State* v. *Mekoshvili*, supra, 344 Conn. 681.

We recently addressed the issue of unanimity as it relates to self-defense in *Mekoshvili*. See id., 680–92. In doing so, we explained that "the fact that criminal conduct was not justified . . . is more analogous, for unanimity purposes, to a finding that a single element of a crime was committed than to the crime itself." Id., 685. We further explained that "the statutory [components] of the defense of self-defense . . . simply summarize what it meant under the common law for the otherwise criminal use of force against another person to be deemed reasonable. . . . The various statutory components of a self-defense claim thus are not independently essential elements of a self-defense justification defense that must each be disproven. . . . Rather, those components are more accurately understood as merely triggering circumstances . . . or factors relevant to a determination [of] whether the defendant acted in self-defense." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id., 685–86.

As such, consistent with the well established principle that jurors need not unanimously agree on the underlying brute facts or theory by which the state proves an element of a crime; see, e.g., *Richardson* v. *United States*, 526 U.S. 813, 817, 119 S. Ct. 1707, 143 L. Ed. 2d 985 (1999); we reasoned that, "once the state has successfully convinced the entire jury that the essence of a self-defense justification is lacking, that is, that the defendant's acts of violence were not a reasonable and justified use of physical force, the constitution does not require jurors to [unanimously] agree on why, specifically, the defendant's choice to engage in otherwise criminal conduct was not reasonable" and justified. *State* v. *Mekoshvili*, supra, 344 Conn. 687. Put differently, we reasoned that jurors need not be unanimous as to the means by which the state has disproven the defense of self-defense, so long as they all agree that the state disproved that defense. See id., 686–88.

The defendant is correct that, in *Mekoshvili*, we addressed only whether jurors needed to be unanimous as to which specific component of the defense of self-defense the state has disproven. See id., 676. We did not directly address whether jurors needed to be unanimous as to which statutory disqualification to self-defense the state has proven. However, our reasoning in *Mekoshvili* regarding the components of a self-defense claim, particularly the reasoning that justified our conclusion that the federal constitution does not require a jury's unanimous agreement as to each component in order for the state to disprove self-defense; see id., 685–88; is instructive when we consider whether unanimity is required as to the statutory disqualifications. The animating principle behind our reasoning in *Mekoshvili*, that the state's ultimate burden with respect to self-defense is to persuade all jurors that the defendant's conduct was not justified under the circumstances, applies with equal force to the statutory disqualifications. Indeed, whether the state overcomes a defendant's claim of self-defense by disproving a component, proving a statutory disqualification, or some combination of the two, the result is to establish that the defendant's conduct was not justified as self-defense.

The defendant argues that proving the statutory disqualifications to self-defense is fundamentally different from disproving the components of that defense. The defendant asserts that the federal constitution requires the jury to unanimously agree as to which statutory disqualification the state proved because (1) the state's burden of establishing a statutory disqualification is similar to its burden of proving a defendant guilty of a crime, and (2) the state's attempt to establish that several statutory disqualifications applied in this case is analogous to the state charging a defendant with a duplicitous count in an information that is based on multiple, separate instances of conduct, for which a specific unanimity instruction is typically required to protect a criminal defendant's constitutional right to a unanimous verdict under *State* v. *Douglas C.*, 345 Conn.

421, 432–33, 445–46, 448, 285 A.3d 1067 (2022). We address each argument in turn.

The defendant's attempted analogy between the state's burden of proving a statutory disqualification and its burden of proving a defendant guilty of a crime fails for the same reason that "[t]he various components of a self-defense claim . . . are not independently essential elements of a self-defense justification defense that must each be disproven" by the state. *State* v. *Mekoshvili*, supra, 344 Conn. 686. As we recognized in *Mekoshvili,* for unanimity purposes, self-defense is not analogous to an additional crime. It is more analogous to an element of a crime than to the crime itself. See id., 685; see also, e.g., *People* v. *Mosely*, 488 P.3d 1074, 1079 (Colo. 2021) ("the affirmative defense [of self-defense] effectively becomes an additional element [of the charged offense] . . . that the [state] bears the burden of [dis]proving beyond a reasonable doubt" (emphasis omitted; internal quotation marks omitted)). As such, the statutory disqualifications, like the components of the defense of self-defense, are not analogous to the essential elements of a crime. In order to secure a conviction when a defendant raises a self-defense claim, the state must establish only that the defendant did not justifiably act in self-defense; the state need not prove that one sole and exclusive reason rendered the defendant's actions unjustified. See, e.g., *People* v. *Mosely*, supra, 1080 ("Some members of the jury might believe that the [state] disproved one of the . . . necessary conditions for the defense [of self-defense]. Others might believe that the [state] established one of the . . . exceptions to [that] defense. But so long as *all* jurors conclude that self-defense was disproven beyond a reasonable doubt, that is all that due process requires." (Emphasis in original.)).

Thus, if, for example, six jurors believe that the state has disproven one of the components of the self-defense justification and the other six believe that the state has proven one of the statutory disqualifications, self-defense would be disproven because the jurors unanimously agree

that the defendant's actions were not justified. See, e.g., *Schad* v. *Arizona*, 501 U.S. 624, 650, 111 S. Ct. 2491, 115 L. Ed. 2d 555 (1991) (Scalia, J., concurring in part and concurring in the judgment) ("[w]hen a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her").

The defendant's analogy of statutory disqualifications to a duplicitous count in a criminal information is similarly inapt. As we have explained, a count in an information is duplicitous if "it charges the defendant in a single count with two or more distinct and separate criminal offenses . . . ." *State* v. *Douglas* C., supra, 345 Conn. 425. In *Douglas C.*, we recognized that there are two types of duplicitous charges and that each type "raise[s] two distinct and separate kinds of unanimity issues: (1) unanimity as to a crime's elements . . . and (2) unanimity as to instances of conduct . . . ." Id., 440; see also, id., 432–33. *Douglas C.* involved a claim of unanimity as to instances of conduct because the defendant asserted that he was charged in a single count with "multiple, separate incidents of conduct, each of which," standing alone, "could independently establish a violation of the charged statute." Id., 425–26. We held that "[o]nly if each instance of conduct constitutes a separate violation of the statute is a count duplicitous," thus requiring a specific unanimity instruction. Id., 448.

The defendant contends that, when the state raises multiple statutory disqualifications in an ordinary case of self-defense, the resulting situation is analogous to a duplicitous charge based on instances of conduct. Unlike a count that charges more than one offense, however, statutory disqualifications are simply different means by which the ultimate justification of self-defense may be disproven. Each statutory disqualification may independently establish that the defendant did not act justifiably

in self-defense, and the statutory disqualifications are more akin to alternative ways of violating a criminal statute than to multiple, separate instances of a violation of a statute. The enumeration of multiple, distinct statutory disqualifications in § 53a-19 is therefore no different from a criminal statute that "lists different means of satisfying a single element of a crime, or different ways of committing the crime . . . ." *State* v. *Macchia*, 253 N.J. 232, 254, 290 A.3d 182 (2023).

The defendant presents no convincing reason why, contrary to our reasoning in *Mekoshvili*, the federal constitution would demand a higher burden in disproving self-defense via a statutory disqualification. In fact, "[w]e fail to see . . . how the purposes behind the unanimity requirement would be served by requiring a properly charged jury—one instructed that it had to be unanimous in its rejection of self-defense—to engage in further deliberations to reach unanimous consensus as to the specific" statutory disqualification the state sought to prove. *State* v. *Mekoshvili*, supra, 344 Conn. 691. The imposition of a specific unanimity requirement to the statutory disqualifications would "result in hung juries in cases in which the jurors actually agree [on] the defendant's guilt . . . ." (Internal quotation marks omitted.) Id.

We are not alone in our view that the federal constitution does not require a jury to be unanimous on the components of a self-defense claim or the statutory disqualifications. We note that "[t]he handful of sister state courts that have considered the question likewise have held that no specific unanimity instruction is necessary, even when . . . distinct theories of self-defense or distinct statutory exceptions to the self-defense justification were at issue."[5] Id., 684.

[5] See, e.g., *People* v. *Mosely*, supra, 488 P.3d 1080 ("so long as the jury unanimously agrees that self-defense was disproven beyond a reasonable doubt, it need not be unanimous as to the specific reason," including which necessary condition for that defense was disproven or which exception to that defense was proven); *Commonwealth* v. *Humphries*, Docket No. 15-P-1018, 2017 WL 118085, *2–3 and n.4 (Mass. App. January 12, 2017) (decision without published opinion, 91 Mass. App.

In sum, consistent with our reasoning in *Mekoshvili*, we conclude that, although a jury must reject a self-defense claim unanimously before it may find a defendant guilty, the federal constitution does not require the jury to reach unanimity as to either the specific component of the defendant's defense that failed or the specific statutory disqualification that applied. As in *Mekoshvili*, we leave "open the possibility that a specific unanimity instruction might be required in exceptional cases involving multiple victims, multiple acts of self-defense, or other unusually complex factual scenarios . . . ." Id., 692; see also id., 692 n.12. Despite the defendant's assertion

1101, 75 N.E.3d 1148) (jury need not be unanimous as to which of five theories of self-defense, which included theory "'that the defendant was the first to use or threaten force and did not withdraw in good faith from the conflict and announce to the person he . . . provoked the defendant's intention to withdraw and end the confrontation without any use or additional use of force,'" was proven by commonwealth), review denied, 477 Mass. 1104, 88 N.E.3d 1166 (2017); *State* v. *Macchia*, supra, 253 N.J. 255–56 (jury need not be unanimous "as to why self-defense was rejected," such as because it found that state had "prove[n] that [the] defendant's belief [of danger] was not honest and reasonable," "that [the] defendant provoked the encounter," or "that [the] defendant could have retreated"); *State* v. *Huish*, 208 N.E.3d 270, 285–86 (Ohio App.) (jury was not required to be unanimous as to which of three elements of self-defense state had disproven beyond reasonable doubt by showing that defendant "(1) was at fault in creating the situation giving rise to the affray . . . (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, [or] (3) did violate a duty to retreat or avoid the danger" (internal quotation marks omitted)), cause dismissed, 171 Ohio St. 3d 1452, 218 N.E.3d 961 (2023); *Rodriguez* v. *State*, 212 S.W.3d 819, 821–22 (Tex. App. 2006) (jury need not unanimously agree as to why defendant's conduct was not justified by self-defense, such as that defendant "did not reasonably believe that the use of deadly force was immediately necessary to protect himself" or that defendant provoked victims' use or attempted use of unlawful force); see also, e.g., *State* v. *Mower*, Docket Nos. 41484-8-II, 41485-6-II, 2012 WL 3679593, *6 (Wn. App. August 28, 2012) (decision without published opinion, 170 Wn. App. 1016) ("[the defendant] fail[ed] to cite any law requiring an instruction that the jury must be unanimous on which element of an affirmative defense has been proved or disproved"), review denied, 176 Wn. 2d 1015, 297 P.3d 707 (2013); *Mavigliano* v. *State*, 578 P.3d 800, 804–805 (Wyo. 2025) (trial court did not violate "clear and unequivocal rule of law" by failing to give specific unanimity instruction on self-defense).

to the contrary, this is not such a case.[6] Because the defendant was not constitutionally entitled to a specific unanimity instruction as to the statutory disqualifications to self-defense, we conclude that his claim fails under the third prong of *Golding*.

## II

The defendant raises three additional claims of instructional error. Specifically, he claims that the jury instructions on the initial aggressor statutory disqualification to self-defense failed to make clear that **(1)** the victim could be the initial aggressor, and **(2)** a person cannot be considered an initial aggressor on the basis of words alone. In his third claim, he contends that the trial court's written instructions incorrectly identified the recklessness-based lesser included offenses of murder as "deliberate" crimes.

We begin by setting forth the standard of review and legal principles that guide our analysis. "A challenge to the validity of jury instructions presents a question of law over which [we have] plenary review." (Internal quotation marks omitted.) *State* v. *Collins*, 299 Conn. 567, 599, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). "An improper instruction on a defense, like an improper instruction on an element of an offense, is of constitutional dimension. . . . [T]he standard of review to be applied to the defendant's constitutional claim is whether it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect [on] the jury in guiding [it] to a correct verdict in the case. . . . The test to be applied to any part of a charge is whether

---

[6] The facts underlying the defendant's claim of self-defense were straightforward, as the altercation between the victim and the defendant was brief, lasting only about sixty-two seconds, and took place within the small area inside the victim's truck and outside of the driver's side door of his truck. See, e.g., *State* v. *Bailey*, 209 Conn. 322, 337–38, 551 A.2d 1206 (1988).

the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Internal quotation marks omitted.) *State* v. *Washington*, 345 Conn. 258, 273, 284 A.3d 280 (2022).

The defendant acknowledges that his claims are unpreserved because he did not file any requests to charge and defense counsel failed to object to the instructions delivered to the jury. Therefore, he seeks review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40, as modified by *In re Yasiel R.*, supra, 317 Conn. 781. We conclude that the defendant cannot prevail on his claims of instructional error because there was no reasonable possibility that the jury was misled by the trial court's instructions, and, therefore, no constitutional violation occurred. We address each claim in turn.

## A

First, the defendant claims that the trial court, in its instructions on the law of self-defense, improperly led the jury to believe that, as a matter of law, only the defendant, and not the victim, could be the initial aggressor. The defendant argues that, due to an additional phrase that the court added to this state's model jury charge, the instruction was impermissibly confusing and compelled the conclusion that, even if the jury found that the victim had created a threat of force that caused the defendant to use force first, the victim could not have been the initial aggressor. We are not persuaded that it is reasonably possible that the jury was misled. Rather, we conclude that the court's instructions on self-defense, as a whole, made abundantly clear that the victim could have been the initial aggressor.[7]

The trial court's instructions on the initial aggressor statutory disqualification to self-defense largely followed the applicable part of our state's model jury charge. See Connecticut Criminal Jury Instructions

[7] Because we conclude that the defendant's claim fails on the merits, we do not address the state's contention that defense counsel implicitly waived this claim of instructional error under *State* v. *Kitchens*, 299 Conn. 447, 482–83, 10 A.3d 942 (2011).

2.8-2, supra. In relevant part, the court provided the following instruction to the jury: "To prove that the defendant was the initial aggressor in his encounter with [the victim], the state need not prove that the defendant was the first person to use physical force in that encounter. The initial aggressor can be the person who threatened to use physical force or even the first person who appeared to threaten the imminent use of physical force under the circumstances *justifying the defendant to respond by using reasonable physical force in self-defense*." **(Emphasis added.)** Although the first portion of the trial court's instruction is virtually identical to the model jury charge, the court added the italicized phrase, to which the defendant objects.

The trial court's jury charge on the initial aggressor disqualification with the added phrase is a correct statement of the law. But cf. *State* v. *Jimenez*, 228 Conn. 335, 338–42, 636 A.2d 782 (1994) **(**there was reasonable possibility that jury was misled when instructions included patently incorrect definition of "aggressor" as "the first [person] to use physical force" **(**emphasis omitted; internal quotation marks omitted**))**. Because the challenged instruction was phrased in neutral terms by using the term "person" with respect to the initial aggressor, it made clear that the victim may be the initial aggressor if he "threatened to use physical force or even . . . appeared to threaten the imminent use of physical force . . . ." The additional phrase, "justifying the defendant to respond by using reasonable physical force in self-defense," informed the jury that the threatened use of force by the victim—the only other "person" at issue—could justify the defendant's actual use of force. Accordingly, the court's charge on the initial aggressor disqualification must be understood to incorporate the notion that, if the victim was the first person to threaten, or reasonably appear to threaten, the imminent use of physical force, the victim was the initial aggressor, and the defendant could have been justified in using reasonable actual force first. Cf. *State* v. *Revels*, 313 Conn. 762, 785, 99 A.3d 1130 (2014), cert. denied, 574 U.S.

1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). In the present case, the court's instruction highlighted that, even though the defendant was the first to use physical force, the jury could find his actions justified if it concluded that the victim caused the defendant to actually and reasonably believe that he was in imminent danger of death or serious physical injury.

Accordingly, we are confident that the challenged language did not cause confusion and that the trial court's instructions made clear to the jury that it could find that the victim was the initial aggressor. We conclude therefore that it was not reasonably possible that the jury was misled and that the defendant's first claim of instructional error fails under the third prong of *Golding*.

### B

Next, the defendant claims that the trial court's charge failed to inform the jury that it could not find him to be the initial aggressor on the basis of his words alone.[8] The defendant argues that, given the prosecutors' emphasis during closing argument on the defendant's words during the altercation with the victim, the court's failure to explicitly clarify this principle likely misled the jury to believe that the defendant was the initial aggressor simply because he initiated a verbal confrontation with the victim. The state responds that there is no reasonable possibility that the instructions on the initial aggressor disqualification misled the jury because the prosecutors did not suggest that the defendant's words alone made him the initial aggressor, and the entire self-defense charge made that principle clear. We agree with the state.

During closing argument, the prosecutors asserted that the initial aggressor disqualification applied because the defendant—while armed with a gun—followed the victim's truck in his car, approached the victim's truck on foot, verbally confronted the victim, and eventually stated, "I'm ready to shoot," while his hands were on

---

[8] Defense counsel did not request the trial court to provide an explicit "words alone" instruction.

the outside of his right pants pocket. We see no reason why the trial court would be constitutionally obligated to instruct the jury on the "words alone" doctrine under those circumstances, particularly when the prosecutors argued that the defendant was the initial aggressor because of "the *combination* of [his] verbal and physical conduct"; (emphasis in original) *State* v. *Singleton*, 292 Conn. 734, 764, 974 A.2d 679 (2009); and the court "repeatedly explained the principle that one cannot use physical force against another unless his subjective belief that that person is about to use physical force against him was reasonable under the circumstances." *State* v. *Jones*, 320 Conn. 22, 55, 128 A.3d 431 (2015).[9]

Because "there was no suggestion by the court or by either party that the person who was the initial aggressor had threatened the other person on the basis of words alone," we conclude that it is not reasonably possible that the trial court's charge on the initial aggressor disqualification led the jury to believe that the defendant's words, by themselves, made him the initial aggressor. *State* v. *Singleton*, supra, 292 Conn. 764; see, e.g., id., 763–64 (lack of words alone instruction was not misleading when prosecutor argued that defendant was initial aggressor because defendant blocked victim's exit from apartment, made violent threat, and advanced toward victim). Accordingly, the defendant's second claim of instructional error fails under *Golding*'s third prong.

C

Lastly, the defendant claims that the trial court likely misled the jury as to the state of mind required to find him guilty of the various lesser included offenses of murder. Again, we are not persuaded.

The following additional facts and procedural history are relevant to our analysis. The trial court instructed the jury on the following three lesser included offenses

___

[9] Because we are reviewing the case only for constitutional error under *Golding*, we express no opinion as to whether the defendant would have been entitled to a "words alone" instruction if it had been requested.

of murder: intentional manslaughter in the first degree with a firearm in violation of §§ 53a-55a (a) and 53a-55 (a) (1), reckless indifference manslaughter in the first degree with a firearm in violation of §§ 53a-55a (a) and 53a-55 (a) (3), and reckless manslaughter in the second degree with a firearm in violation of § 53a-55a (a) and General Statutes § 53a-56 (a) (1). The trial court instructed the jurors that they were to reach the recklessness-based lesser included offenses only if they found the defendant not guilty of both murder and intentional manslaughter with a firearm.

With respect to each of the two recklessness-based lesser included offenses, the trial court instructed the jury as to the meaning of recklessness: "A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such a nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

When the jury began deliberations, the trial court provided the jury with a nine page document outlining the state's charges against the defendant, the proper sequence of the deliberations, and the possible verdicts (instructional summary document). Under count one, which charged murder, the instructional summary document began by stating: "As I have already explained, you must consider the offenses in the sequence set forth." After an enumeration of the possible verdicts as to the murder charge, the instructional summary document included a list of the possible verdicts for each lesser included offense, and the list for intentional manslaughter in the first degree with a firearm appeared first. Each of the three lists appeared under a header that read, "DELIBERATE LESSER INCLUDED OFFENSES."

The defendant asserts that jurors reading the instructional summary document would likely construe the

word "deliberate" as an adjective rather than a verb. The defendant argues that, because the word "deliberate," when used as an adjective, is synonymous with the word "intentional," the "deliberate lesser included offenses" language in the instructional summary document likely led the jurors to believe that all three lesser included offenses require the same mens rea, despite the fact that the two recklessness-based lesser included offenses do not require the same degree of intent as intentional first degree manslaughter with a firearm.

We conclude that the defendant's claim fails under *Golding*'s third prong because there is no reasonable possibility that the jury was misled. The instructional summary document informed the jury when to "deliberate" regarding the lesser included offenses, and, because the trial court verbally provided clear, concise, and complete instructions on the recklessness-based lesser included offenses, there is no reasonable possibility that the jury misread "deliberate," as the defendant contends.[10]

## III

Next, we address the defendant's claims that the evidence was insufficient both (1) to disprove his claim of self-defense, and (2) to support his conviction of intentional manslaughter in the first degree with a firearm in violation of §§ 53a-55a (a) and 53a-55 (a) (1).

The following well established principles govern our review of these claims. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether [on] the facts so construed and the inferences reasonably drawn therefrom the [jury]

---

[10] We recognize that the instructional summary document was not a model of clarity, but we fail to see how any constitutional error could have occurred. The trial court instructed the jury that, if it found the defendant guilty of intentional manslaughter in the first degree with a firearm, it should not go on to consider the other lesser included offenses. Therefore, we presume that the jury never even reached the recklessness-based manslaughter offenses because it had found the defendant guilty of intentional manslaughter with a firearm. See, e.g., *State* v. *Sharpe*, 353 Conn. 564, 596–97, 343 A.3d 408 (2025) (recognizing presumption that jury follows trial court's instructions).

reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Internal quotation marks omitted.) *State* v. *Revels*, supra, 313 Conn. 778; see also, e.g., *State* v. *Johnson*, supra, 351 Conn. 62–63 (applying same standard of review to sufficiency of evidence claims relating to disproving claim of self-defense and proving criminal offense).

### A

We first address the defendant's claim that the state failed to satisfy its burden of disproving his claim of self-defense beyond a reasonable doubt. The state argues that the evidence was sufficient for the jury to find, beyond a reasonable doubt, that the defendant did not reasonably believe that the victim was using or about to use physical force against him or that deadly physical force was necessary to defend himself. We agree with the state. Because we conclude that the evidence was sufficient to disprove a component of the defendant's self-defense claim beyond a reasonable doubt, we need not consider whether the state also proved beyond a reasonable doubt any of the statutory disqualifications to self-defense.

We begin by setting forth the relevant legal principles that govern a claim of self-defense. Section 53a-19 (a) provides in relevant part: "Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself . . . from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm."

As we have observed, the four components that "must exist for an act of violence to be justified on the [ground] of self-defense . . . [are] **(1)** the defendant must actually have believed that the victim was using or was about to use physical force against him . . . **(2)** a reasonable person . . . would have shared that belief, **(3)** the defendant must actually have believed that the degree of force he used was necessary for defending himself . . . and **(4)** a reasonable person . . . also would have shared that belief." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 351 Conn. 61.

At trial, the evidence established that, after the victim's truck had noisily driven past the defendant, the defendant followed the truck in his car, pulled up next to the parked truck and stared into the passenger side window, drove away and parked his car on a nearby street, returned to the truck on foot while armed with a gun, verbally confronted the victim, unsuccessfully tried to obtain possession of the victim's BB gun after the victim had grabbed it, drew his gun, fired multiple shots at the truck, and then fled the scene. The principal factual dispute with respect to the defendant's claim of self-defense was what occurred in the moments between the struggle for the victim's BB gun and the defendant's shooting the victim.

The defendant claimed that, after the victim reached for his BB gun and the defendant failed to disarm him, the victim had the BB gun in his right hand. The defendant asserted that, because he thought the victim was about to shoot him, he drew his own gun and fired sporadically to startle the victim and to provide himself with an opportunity to escape. Relying on the defendant's testimony, defense counsel argued that, because the BB gun "look[ed] like a real gun," the neighborhood had a dangerous reputation, and the defendant's half brother previously had been fatally shot while walking away from an argument, the defendant had a reasonable, subjective belief that the victim was about to use deadly physical

force or to inflict great bodily harm and that firing his weapon was necessary to defend himself.

In addition to his own testimony, the defendant relied on the following evidence in support of his claim of self-defense. Sanchez testified that, after the victim was shot, he collapsed into her lap and came to rest "on [her] legs . . . ." Because the police found the BB gun on the floor of the passenger's side of the victim's truck, defense counsel argued that the evidence showed that the BB gun was in the victim's right hand when the defendant shot him and that it fell to the floor when the victim slumped over into the passenger seat. On recross-examination, Sanchez acknowledged that the victim's BB gun "look[ed] pretty real . . . ." Furthermore, Ann Testa, a detective with the New Haven Police Department who investigated the crime scene, testified on cross-examination that, because the bullet holes in the door of the victim's truck were not located together in a "tight grouping," the defendant discharged the gun potentially "in haste" and with poor aim.

The state, on the other hand, relied on the testimony of Sanchez, which largely contradicted the defendant's account of the altercation in important respects. Sanchez testified that, after the defendant failed to obtain possession of the BB gun, "the BB gun stayed on the dashboard" of the victim's truck, and the defendant "took out his gun and . . . pointed it at [her] and then . . . at [the victim]." Thus, according to Sanchez, the BB gun was not in the victim's right hand in the moments before the shooting. In fact, Sanchez testified that, "when [the defendant] first was pointing [his gun] at [them], [the victim] had . . . his hands up, as if . . . there's nothing that [they] could do . . . because [the defendant] was pointing at [them]." Sanchez also testified that the victim then "told [her] . . . 'honey, just get out of the way, move,' and . . . pushed [her] against the seat, and that's when . . . the first bullet was fired, and it hit [the victim] . . . in the left eye." Sanchez further explained that, while the

defendant attempted to take the BB gun away from the victim, she repeatedly yelled, "[i]t's a fake gun!"

Given the standard of review, we presume that the jury chose to credit the portions of Sanchez' testimony that contradicted the defendant's account, which rendered the evidence sufficient to find that the state disproved beyond a reasonable doubt at least one component of the defendant's self-defense claim. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 400, 267 A.3d 81 (2021) ("[t]he jury . . . was free to discredit the defendant's version of the events immediately preceding and following the shooting and, instead, could have credited the testimony of the other witnesses"). Considering Sanchez' testimony that the victim's BB gun was on the dashboard and that the victim's hands were up when the defendant pointed his gun at the victim and fired, we conclude that the jury reasonably could have found, beyond a reasonable doubt, that the defendant did not actually believe that the victim was using or about to use deadly physical force against him, or was inflicting or about to inflict great bodily harm, or that a reasonable person would not have shared that belief under the circumstances. Furthermore, even if the jury had a reasonable doubt as to whether the victim had his BB gun in his right hand when the defendant shot him, the jury reasonably could have found, on the basis of Sanchez' testimony that she repeatedly yelled that the BB gun was "a fake gun" before the defendant fired any shots, that the defendant did not actually believe that deadly physical force was necessary to defend himself, or that such a belief was objectively unreasonable.

Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have determined that the cumulative force of the evidence disproved the defendant's claim of self-defense beyond a reasonable doubt. We therefore reject the defendant's claim that the evidence was insufficient to defeat his claim of self-defense.

## B

The defendant claims that there was insufficient evidence to establish that he acted with the specific intent necessary to support his conviction of intentional manslaughter in the first degree with a firearm in violation of §§ 53a-55a (a) and 53a-55 (a)(1). The defendant argues that the evidence supported, at most, a reasonable inference that he acted recklessly and impulsively when he shot the victim at close range after he failed to obtain possession of the victim's BB gun. We are unpersuaded.

Section 53a-55a (a) provides in relevant part that "[a] person is guilty of manslaughter in the first degree with a firearm when he commits manslaughter in the first degree as provided in section 53a-55, and in the commission of such offense he uses" a firearm. Section 53a-55, in turn, provides in relevant part: "(a) A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person . . . ." An intent to cause serious physical injury may be inferred "from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Smith*, 73 Conn. App. 173, 181, 807 A.2d 500, cert. denied, 262 Conn. 923, 812 A.2d 865 (2002); see also, e.g., *State* v. *Dixon*, 353 Conn. 382, 406, 342 A.3d 161 (2025). A defendant's act of shooting a person at close range may independently support the inference that there was an intent to cause serious physical injury to that person. See, e.g., *State* v. *Edwards*, 247 Conn. 318, 322–23, 721 A.2d 519 (1998) (there was inference of intent to kill when defendant shot victim in head at close range); see also, e.g., *State* v. *Higgins*, 265 Conn. 35, 71, 826 A.2d 1126 (2003) ("one cannot intend to cause death without necessarily intending to cause physical injury" (internal quotation marks omitted)).

In the present case, the jury reasonably could have found that the defendant had acted with specific intent

to cause serious physical injury to the victim on the basis of Sanchez' testimony and the nature of the shooting. Sanchez testified that the defendant escalated the verbal confrontation by twice stating that he was "ready to shoot," and that, shortly thereafter, he took two steps back from the driver's side door of the victim's truck and pointed his gun at her and then at the victim. It is undisputed that the defendant ultimately shot the victim in the left eye from close range. Indeed, Gregory Vincent, the medical examiner who performed an autopsy on the victim, testified that "stippling"[11] on the victim's face indicated that, when he was shot, "the muzzle of the gun was within six . . . to thirty inches" of his head.

Viewing this evidence in the light most favorable to sustaining the verdict, we conclude that the jury reasonably could have found that the cumulative force of the evidence established beyond a reasonable doubt that the defendant had the requisite intent to commit intentional manslaughter in the first degree with a firearm.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[11] During his testimony, Vincent explained that "stippling" refers to the abrasions or scrapes that result when "unburnt particles of gunpowder or partially burnt particles of gunpowder" impact the skin.